**FREDERICK L., et al., Plaintiffs,**

v.

**DEPARTMENT OF PUBLIC WELFARE, et al., Defendants.**

**Civ. A. No. 00–4510.**

United States District Court, E.D. Pennsylvania.

July 23, 2001.

Mark J. Murphy, Robert W. Meek, Philadelphia, PA, for plaintiffs.

Claudia M. Tesoro, Office of Attorney General, Philadelphia, PA, Howard Ulan, Dept. of Public Welfare, Harrisburg, PA, for defendants.

### OPINION AND ORDER

SCHILLER, District Judge.

Four adult individuals institutionalized at Norristown State Hospital ("NSH") bring this five-count action against the Department of Public Welfare of the Commonwealth of Pennsylvania ("DPW"), which operates NSH, a psychiatric hospital located in Norristown, Pennsylvania, and Feather O. Houstoun, Secretary of Public Welfare for the Commonwealth of Pennsylvania. Plaintiffs allege violations of Title II of the Americans with Disabilities Act ("ADA" or "Title II"), 42 U.S.C. § 12131 (1994), *et seq.*, the Rehabilitation Act of 1973 ("section 504"), 29 U.S.C. § 794(a) (1994 & Supp. IV 1998), and 42 U.S.C. § 1983 (1994) ("section 1983"). Plaintiffs are suing on behalf of themselves and other similarly situated individuals institutionalized at NSH,[1] in order "to challenge their unnecessary segregation in NSH and Defendants' failure to provide them with appropriate services in the community—the most integrated setting appropriate to their needs." (First Am. Compl. at ¶ 1).

In addition to disturbing factual allegations, this case presents complicated and unsettled questions of law, both constitutional and statutory. Several of these questions have been the subject of splits among the courts and debates among commentators.

Presently before the Court is Defendants' motion to dismiss[2] (Document Nos. 4 and 18), attacking Plaintiffs' claims on the grounds that they are barred by the Eleventh Amendment and that Plaintiffs have otherwise failed to state a claim upon which relief can be granted. For the reasons that follow, Defendants' motion is granted in part and denied in part. Counts II and IV of the first amended complaint, consisting of claims brought under the ADA against the DPW are dismissed. Plaintiffs may proceed on their section 504 claims against both defendants, their ADA claims against Houstoun, and their section 1983 claim against Houstoun.

### I. BACKGROUND[3]

The four Plaintiffs, Frederick L., Nina S., Kevin C., and Steven F., are individuals with mental disabilities institutionalized at NSH. Frederick L. has been recommended for discharge to a community program since at least July of 1997. Nina S. has not been officially recommended for discharge. Kevin C. has been recommended for discharge to a community program since at least February of 1999. Steven F. has also been recommended for discharge to a community program. The

1. Plaintiffs seek to represent "a class comprised of all persons institutionalized at Norristown State Hospital ("NSH"), other than those in the Regional Forensic Unit and Juvenile Forensic Unit." (First Am. Compl. at ¶ 17). Plaintiffs' motion for class certification is pending.

2. Defendants filed their motion to dismiss the complaint on November 27, 2000. During oral argument held on this motion, plaintiffs addressed a claim pursuant to 42 U.S.C. § 1983. Defendants indicated that they were unaware that such a claim was being asserted. Because the complaint included only a single reference to 42 U.S.C. § 1983 in the context of pleading a basis for this Court's jurisdiction, I directed Plaintiffs to file an amended complaint more clearly setting forth their 42 U.S.C. § 1983 claim. Plaintiffs filed their first amended complaint on May 4, 2001. Thereafter, Defendants moved for its dismissal. I address both motions herein and refer to them generally in the collective sense as Defendants' "motion to dismiss." Where appropriate, I will cite either to Defendants' motion to dismiss or Defendants' motion to dismiss Plaintiffs' first amended complaint.

3. The facts contained in this section were drawn from Plaintiffs' first amended complaint.

pleadings do not reflect the date of this recommendation.

## A. Funding of Pennsylvania's mental health services

In Pennsylvania, mental health services are funded by the Commonwealth, its counties, and the federal government. Services to individuals with mental disabilities can be provided in many settings, ranging from independent living arrangements, where the individual may reside alone, to psychiatric institutions. There is a complex scheme for the allocation of financial responsibility among these governmental entities. At this stage, a brief rehearsal of the manner in which mental health services are funded is necessary.

The Commonwealth is responsible for all of the treatment and care costs of residents at state psychiatric hospitals. *See* 50 PA. CONS.STAT.ANN. § 4507(a)(1) (1969); 55 PA.CODE § 4300.23(a)(1) (Supp. 244 1995). Community-based mental health services are funded by the Commonwealth and its counties, each paying 90 percent and 10 percent, respectively. *See* 50 PA. CONS.STAT.ANN. § 4509(1) (Supp.2001); 55 PA.CODE § 4300.23(b). Federal funding, through various programs, including the Medical Assistance Program [4] and social services block grants [5] is available to defray part of the Commonwealth's costs for non-residential, community-based services provided by the counties.

Additionally, over recent years, the DPW has intermittently provided funds to the counties through the Community Hospital Integrated Project Program ("CHIPP").[6] Funds distributed through this program are earmarked for use in developing the resources necessary to discharge institutionalized individuals from state psychiatric hospitals. As counties receive CHIPP/SIPP funds, the number of beds in state psychiatric hospitals that can be used by individuals from recipient counties without cost to those counties is reduced.

The DPW has the authority to shift funds used for institutionalized care to community care. The counties make annual requests to the DPW for funds needed to provide appropriate community-based services. The DPW, however, has consistently failed to satisfy the requests of those counties whose residents are institutionalized at NSH (Bucks, Chester, Delaware, Montgomery, and Philadelphia). As a result, all of the individuals with mental disabilities who could be appropriately served in the community cannot be accommodated and remain unnecessarily institutionalized where they are either not recommended for discharge or placed on waiting lists for community care indefinitely.

## B. Averments

Plaintiffs allege that with the appropriate services, they could live successfully in

---

**4.** Pennsylvania's Medical Assistance Program is administered by the DPW.

The Medical Assistance Program is a cost-sharing arrangement authorized by Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396v (1992 & Supp.1997). Under this program, the state and federal governments finance Medical Assistance to individuals whose resources are insufficient to cover the costs of their medical care. *Anderson v. Dept. of Pub. Welfare,* 1 F.Supp.2d 456, 459, 459 n. 1 (E.D.Pa.1998).

**5.** Social services block grants, available under Title XX of the Social Security Act, 42 U.S.C. §§ 1397–1397f (1994), provide funding for, *inter alia,* "preventing or reducing inappropriate institutional care by providing for community-based care, home-based care, or other forms of less intensive care." 42 U.S.C. § 1397(4).

**6.** In the southeast region of the Commonwealth, this program is now known as the Southeastern Integrated Project Program ("SIPP").

the community, which is the most integrated setting appropriate to their needs. Defendants are ultimately responsible for assuring that mental health services are provided to all Pennsylvania residents who need them. The Defendants have failed to properly assess the Plaintiffs' community service needs and fund sufficient appropriate community-based programs to serve them. NSH residents are not evaluated in order to determine whether their needs could be served in the community if appropriate programs were established. Instead, residents are recommended for discharge "based on the capacity of the individual to fit—however awkwardly—into existing programs." (First Am. Compl. at ¶ 62). Compounding this problem is the fact that some NSH professionals do not know what services are available in the community. As a result, residents who could be served in the community are not recommended for discharge. This occurred in the case of Plaintiff Nina S.

Plaintiffs further allege that in the 2001–02 fiscal year, NSH plans to discharge 60 elderly and medically fragile non-forensic residents of NSH and provide them with community-based services due to structural problems requiring that the medical/elderly unit be closed, not individualized assessments of the residents to determine their needs. As a result of this discharge plan, Plaintiffs will be "institutionalized indefinitely at NSH," as the DPW has no plan to discharge them. (First Am. Compl. at ¶ 2).

In Counts I and II of the first amended complaint, Plaintiffs claim that Defendants DPW and Houstoun violate section 504 and Title II of the ADA, respectively, "by failing to provide services to Plaintiffs in the most integrated setting appropriate to their needs." ("integration mandate claims") (First Am. Compl. at ¶¶ 72, 77). In Counts III and IV, Plaintiffs charge

that Defendants DPW and Houstoun violate section 504 and Title II of the ADA, respectively, by "using methods of administration that have the effect of subjecting Plaintiffs and the proposed class to discrimination on the basis of disability." ("methods of administration claims") (First Am. Compl. at ¶¶ 80, 83). Count V embodies the allegation that Defendant Houstoun violated the Plaintiffs' rights under section 504 and Title II of the ADA by establishing a DPW policy of refusing and failing to "provide mental health services to Plaintiffs and the class they represent in the most integrated setting appropriate to their individual needs," as prohibited by section 1983. (First Am. Compl. at ¶ 88).

### C. Relief requested

Plaintiffs seek a declaration that the Defendants have violated Plaintiffs' rights and an injunction compelling the Defendants to remedy the ongoing violations of federal law.

### D. Motion to dismiss

Defendants filed their motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing that this Court lacks subject matter jurisdiction over this action because the DPW is immune from suit under the Eleventh Amendment. Moreover, Defendants contend that Plaintiffs fail to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6) because (1) Houstoun is not a proper Defendant under the ADA or section 504; (2) Section 1983 is not a proper mechanism to enforce rights conferred by section 504 and the ADA; (3) Section 504 does not obligate states to provide community care for the mentally ill; and (4) Plaintiffs' section 504 and ADA claims are foreclosed by the Supreme Court's decision in *Alexander v. Sandoval*, 531 U.S. 1049, 121 S.Ct. 1511, 149 L.Ed.2d 517

(2001). Finally, if Plaintiffs' ADA claims are not completely barred on other grounds, Defendants argue that the Plaintiffs' claims are limited by the Supreme Court's decision in *Olmstead v. L.C.*, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999).

## II. LEGAL STANDARD

In considering a Rule 12(b)(6) motion, the Court must accept as true all of the allegations set forth in the complaint and all reasonable inferences must be drawn in favor of the Plaintiffs. *See Ford v. Schering–Plough Corp.*, 145 F.3d 601, 604 (3d Cir.1998). Dismissal of Plaintiffs' claim is appropriate only if Plaintiffs "can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Id.* (quotation omitted).

Defendants raise the issue of Eleventh Amendment immunity under Rule 12(b)(1) on subject matter jurisdiction grounds. In *Blanciak v. Allegheny Ludlum Corporation*, 77 F.3d 690 (3d Cir.1996), the Third Circuit recognized that "the Eleventh Amendment is a jurisdictional bar which deprives federal courts of subject matter jurisdiction." *Id.* at 694 n. 2 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). The Third Circuit went on to say that such a motion may be filed pursuant to Rule 12(b)(1). *See id.* One year before, however, our court of appeals stated that Eleventh Amendment immunity "does not implicate federal subject matter jurisdiction in the ordinary sense" because it "can be expressly waived by a party, or forfeited through non-assertion." *Christy v. Pa. Turnpike Comm'n*, 54 F.3d 1140, 1144 (3d Cir.1995). As such, the Third Circuit determined in *Christy* that Eleventh Amendment immunity should be analyzed as an affirmative defense to be established by the party raising it. *See id.* Where Eleventh Amendment immunity was asserted in a motion to dismiss for lack of subject matter jurisdiction, this Court has evaluated the motion under the standard provided for by Rule 12(b)(6). *See Elman v. United States*, 1998 WL 195905, at *1 (E.D.Pa. Apr. 6, 1998).

There are two types of Rule 12(b)(1) motions. With regard to the first type, a facial attack on the court's subject matter jurisdiction, the court is required to assume that plaintiff's allegations are true. *See Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). When confronted with the second type, a factual attack, the court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case" because there is "no presumptive truthfulness attache[d] to plaintiff's allegations." *Id.* Factual evaluations under Rule 12(b)(1) are appropriate at any stage in the proceedings after the filing of an answer. *See id.* at 891–92. Here, no answer has been filed. Thus, regardless of whether I treat Defendants' assertion of the Eleventh Amendment bar as a motion under Rule 12(b)(1) or Rule 12(b)(6), I am required to take Plaintiffs' facts as true.

I am mindful that the Third Circuit has "cautioned against treating a Rule 12(b)(1) motion as a Rule 12(b)(6) motion and reaching the merits of the claims" because "the standard for surviving a Rule 12(b)(1) motion is lower than that for a 12(b)(6) motion." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 178 (3d Cir.2000) (citation omitted). In considering whether Defendants' are protected from suit by the Eleventh Amendment, I will avoid evaluation of the merits of Plaintiffs' claims.

## III. DISCUSSION

### A. Eleventh Amendment

Defendants argue that Plaintiffs' section 504 and ADA claims against the DPW are

precluded by the Eleventh Amendment. While by its precise terms, the Eleventh Amendment bars federal court actions against the States brought by a citizen of other States, the Supreme Court has long recognized that its prohibition also applies to suits against the States by their own citizens.[7] *See Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 962, 148 L.Ed.2d 866 (2000) (citations omitted); *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 669, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999). "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Garrett*, 121 S.Ct. at 962 (citation omitted); *see Alden v. Maine*, 527 U.S. 706, 713, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) (observing that "as the Constitution's structure, and its history, and the authoritative interpretations by this Court make clear, the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution and which they retain today").

Thus, while the States are generally immune from suit brought by private individuals, there are three well-established exceptions to the bar. First, the States may consent to suit, waiving their immunity. *See Alden*, 527 U.S. at 755, 119 S.Ct. 2240. Second, "Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of con-

stitutional authority." *Garrett*, 121 S.Ct. at 962 (quotation omitted). Third, under the doctrine announced in *Ex parte Young*, 209 U.S. 123, 159–60, 28 S.Ct. 441, 52 L.Ed. 714 (1908), and refined in subsequent decisions, an individual seeking only prospective injunctive relief for ongoing violations of federal law may bring suit against state officials in federal courts. *See Alden*, 527 U.S. at 757, 119 S.Ct. 2240; *Seminole Tribe v. Florida*, 517 U.S. 44, 73, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985); *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976).

### 1. State Waiver under Section 504

■ Defendants argue that the Eleventh Amendment prohibits suit against the DPW brought under section 504 (Counts I and III).[8] Plaintiffs assert that their claims can proceed under the first exception to the Eleventh Amendment bar.

In interpreting the Eleventh Amendment, the Supreme Court has recognized two types of waiver: express and implied. The Supreme Court has repeatedly emphasized that a finding of express waiver is appropriate only where the State's intention to subject itself to suit in federal court is stated "by the most express language" or by "overwhelming implications." *Edelman v. Jordan*, 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (quotation omitted); *see Port Auth. Trans–Hudson Corp. v. Feeney*, 495 U.S. 299, 305–06, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990); *Atascadero State Hosp. v. Scanlon*, 473 U.S.

---

**7.** The Eleventh Amendment provides: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.

**8.** Section 504 provides:

No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. 794(a).

234, 241, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). The Court has "insist[ed] ... that the State's consent be unequivocally expressed." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 99, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (*"Pennhurst II"*) (citation omitted).

> Our reluctance to infer that a State's immunity from suit in the federal courts has been negated stems from recognition of the vital role of the doctrine of sovereign immunity in our federal system. A State's constitutional interest in immunity encompasses not merely whether it may be sued, but where it may be sued.

*Id.* Thus, the "test for determining whether a State has waived its immunity from federal court jurisdiction is a stringent one." *Coll. Sav. Bank,* 527 U.S. at 675, 119 S.Ct. 2219 (quoting *Atascadero,* 473 U.S. at 241, 105 S.Ct. 3142).

The instant Plaintiffs do not and cannot argue that Pennsylvania consented to suit by expressing a clear waiver via statute or constitutional amendment. Instead, Plaintiffs take the position that suit under section 504 is proper because Pennsylvania's DPW[9] implicitly consented to suit by ac-cepting federal funds.[10] (Pl. Resp. to Mot. to Dismiss at 7). The Supreme Court examined the doctrine of implied waiver in *Parden v. Terminal Ry. of Ala. State Docks Dept.,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). In *Parden,* the Court concluded that by choosing to operate an interstate railroad approximately 20 years after the enactment of the Federal Employers' Liability Act (FELA), Alabama implicitly consented to suit by injured railroad employees. *Id.* at 192, 84 S.Ct. 1207. The Court stated:

> By adopting and ratifying the Commerce Clause, the States empowered Congress to create such a right of action against interstate railroads; by enacting the FELA in the exercise of this power, Congress conditioned the right to operate a railroad in interstate commerce upon amenability to suit in federal court as provided by the Act; by thereafter operating a railroad in interstate commerce, Alabama must be taken to have accepted that condition and thus to have consented to suit.

*Id.*

Subsequently, the Court declined to find constructive waiver absent a statement

---

9. Section 504 regulates the conduct of any "program or activity" receiving federal financial assistance. *See* 29 U.S.C. § 794(a). "Program or activity" is defined as the department or agency that receives or distributes the federal funds. *See* 29 U.S.C. § 794(b). Here, Plaintiffs allege that the DPW receives federal funds. Such receipt, however, does not affect other state agencies or the state of Pennsylvania as a whole. *See Jim C. v. United States,* 235 F.3d 1079, 1081 (8th Cir.2000).

10. There exists some debate regarding whether there is a conceptual difference between the related doctrines of implied waiver (such as pursuant to a Spending Clause condition) and congressional abrogation. One commentator noted that despite being "hopelessly confused and conflated for some time," the two concepts are distinct. Kit Kinports, *Im-plied Waiver After Seminole Tribe,* 82 MINN. L.REV. 793, 807 (Feb.1998). Kinports separates the two concepts as follows: "Implied waiver presupposes a voluntary decision on the part of the states to forego their Eleventh Amendment protection, whereas abrogation is an exercise of congressional power to remove the states' immunity regardless of their wishes." *Id.* However, a district court in Illinois concluded that "the difference between constructive waiver and abrogation is purely semantic." *Digiore v. Illinois,* 962 F.Supp. 1064, 1075 (N.D.Ill.1997). Without pounding a stake in either camp, and simply in order to distinguish the arguments made by counsel, I will refer to suit in the context of Spending Clause legislation as a type of waiver and suit authorized by Congress in a valid exercise under § 5 of the Fourteenth Amendment as abrogation.

from Congress "indicating in some way by clear language that the constitutional immunity was swept away." *Employees of Dept. of Pub. Health & Welfare v. Dept. of Pub. Health & Welfare,* 411 U.S. 279, 284–85, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973) (concluding state health facility employees could not sue the state for failure to comply with the Fair Labor Standards Act after distinguishing *Parden* by noting that states can opt not to operate a railroad, but cannot choose not to provide basic public services like hospitals); *cf. Coll. Sav. Bank,* 527 U.S. at 677, 119 S.Ct. 2219 ("In *Employees,* we began to retreat from *Parden* "). Similarly, in *Edelman,* 415 U.S. at 673, 94 S.Ct. 1347, the Court ruled that Illinois had not impliedly waived its sovereign immunity by accepting federal monies under a welfare program. The Court noted that "[c]onstructive consent is not a doctrine commonly associated with the surrender of constitutional rights, and we see no place for it here." *Id.* at 673, 94 S.Ct. 1347. The Court observed that the "mere fact that a State participates in a program through which the Federal Government provides assistance for the operation by the State of a system of public aid is not sufficient to establish consent on the part of the State to be sued in the federal courts." *Id.; see Atascadero,* 473 U.S. at 246–47, 105 S.Ct. 3142.

In 1987, the Supreme Court explicitly adopted the requirement of "an unequivocal expression that Congress intended to override Eleventh Amendment immunity." *Welch v. Texas Dept. of Highways and Pub. Trans.,* 483 U.S. 468, 478, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987) (citations omitted) (overruling *Parden* to the extent that it is "inconsistent with the requirement that an abrogation of Eleventh Amendment immunity by Congress must be expressed in unmistakably clear language").

Since 1987, legal scholars have debated the continued vitality of the constructive waiver doctrine in light of the development of Eleventh Amendment jurisprudence from *Parden* to *Welch. Compare,* Erwin Chemerinsky, Federal Jurisdiction § 7.6 (3d ed. 1999) (stating "[i]n short, constructive waiver of the Eleventh Amendment immunity is virtually nonexistent"), *with* Kit Kinports, *Implied Waiver After Seminole Tribe,* 82 Minn.L.Rev. 793, 831 (Feb. 1998) (concluding that the "doctrine of implied waiver continues to be viable").

The Supreme Court's 1999 decision in *College Savings Bank,* however, is instructive in determining the current availability of implied waiver. In *College Savings Bank,* the Court held that Florida did not constructively waive its immunity from suit under the Lanham Act. *Id.* at 691, 119 S.Ct. 2219. In so finding, the Court expressly overruled any surviving notions of *Parden:* "We think that the constructive-waiver experiment of *Parden* was ill conceived, and see no merit in attempting to salvage any remnant of it." *Id.* at 680, 119 S.Ct. 2219.

Despite this apparent extinguishment of the constructive waiver doctrine, *College Savings Bank* does not foreclose Plaintiffs' section 504 claims here. The Court in *College Savings Bank* noted "fundamental" differences between the case before it and the type of case instantly at bar. *Id.* at 686, 119 S.Ct. 2219. The Court recognized:

Congress may, in the exercise of its spending power, condition its grant of funds to the States upon their taking certain actions that Congress could not require them to take, and that acceptance of the funds entails agreement to the actions.... Congress has no obligation to use its Spending Clause power to disburse funds to the States; such funds are gifts. In the present case,

however, what Congress threatens if the State refuses to agree to its condition is not the denial of a gift or gratuity, but a sanction: exclusion of the State from otherwise permissible activity.

*Id.* (citing *South Dakota v. Dole,* 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987)). This distinction compels the finding that pursuant to its Spending Clause authority, Congress can legitimately invite the States to consent to suit in exchange for federal funds.

As a threshold position, Defendants argue that section 504 was enacted pursuant to Congress' power under § 5 of the Fourteenth Amendment, not under the Spending Clause.[11] There exists some ambiguity regarding the authority pursuant to which Congress enacted section 504. Congress itself was silent on the issue. *See Armstrong v. Wilson,* 942 F.Supp. 1252, 1262 (N.D.Cal.1996) ("the Rehabilitation Act is silent as to the constitutional authority under which it was enacted"), *aff'd,* 124 F.3d 1019 (9th Cir.1997), *cert. denied,* 524 U.S. 937, 118 S.Ct. 2340, 141 L.Ed.2d 711 (1998). The Supreme Court has not squarely addressed the issue. In *Welch,* 483 U.S. at 470, 472 n. 2, 107 S.Ct. 2941, the Court commented as follows:

> The question in *[Atascadero v.] Scanlon* was whether § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, makes state agencies subject to suits for retroactive monetary relief in federal court. The Rehabilitation Act was passed pursuant to § 5 of the Fourteenth Amendment. *Atascadero v. Scanlon,* 473 U.S. 234, 244–245, n. 4, 105 S.Ct. 3142, 3149 n. 4, 87 L.Ed.2d 171 (1985). Congress therefore had the power to subject un-

consenting States to suit in federal court. *See Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976).

Without deciding which of its powers Congress exercised in enacting section 504, the Supreme Court in *Atascadero,* 473 U.S. at 240, 105 S.Ct. 3142, examined whether California could be sued in federal court for violations of section 504. The footnote in *Atascadero* referenced by the Court in *Welch* contains an explanation of how the Court would conduct its analysis. *See Atascadero,* 473 U.S. at 244 n. 4, 105 S.Ct. 3142. The Court in *Atascadero* considered whether Congress had validly abrogated the sovereign immunity of the States as if the statute had been enacted pursuant to § 5 *and* whether California had implicitly waived its immunity by accepting federal funds as if section 504 were Spending Clause legislation. *See id.* at 242–247, 105 S.Ct. 3142. Thus, the basis of the congressional authority used in enacting section 504 was not determined by the Supreme Court in *Atascadero.*

While some courts have concluded that section 504 was enacted pursuant to Congress' power under § 5 of the Fourteenth Amendment, *see, e.g., Clark v. California,* 123 F.3d 1267, 1270 (9th Cir.1997), *cert. denied sub. nom., Wilson v. Armstrong,* 524 U.S. 937, 118 S.Ct. 2340, 141 L.Ed.2d 711 (1998); *Mayer v. Univ. of Minn.,* 940 F.Supp. 1474, 1476–80 (D.Minn.1996), I am persuaded by the reasoning employed by the court in *Bowers v. Nat'l Collegiate Athletic Ass'n,* 118 F.Supp.2d 494, 506 (D.N.J.2000), that section 504 is an exercise of Congress' Spending Clause power.[12]

---

**11.** The Defendants concede, however, that the "entire Rehabilitation Act of 1973, of which § 504 is but one section, does have attributes of 'regular' spending clause legislation." (Def. Reply at 6 n. 5).

**12.** I do not evaluate here whether section 504 was a valid exercise of any other congressional authority.

In the end, one need only look at the language of section 504, which conditions the application of its bar against discrimination on the receipt of federal funds, and the fact that section 504 is modeled after Title VI [of the Civil Rights Act of 1964], which was enacted in part under Congress's Spending Clause power, to conclude that section 504 was enacted at least in some measure pursuant to Congress's authority under the Spending Clause.

*Id.* at 506–07 (internal citation and quotation omitted). Several other courts have acknowledged that section 504 is a Spending Clause enactment. *See, e.g., Shinault v. Am. Airlines, Inc.,* 936 F.2d 796, 803 (5th Cir.1991); *Armstrong,* 942 F.Supp. at 1263; *Moreno v. Consol. Rail Corp.,* 909 F.Supp. 480, 487 (E.D.Mich.1994), *aff'd en banc,* 99 F.3d 782 (6th Cir.1996); *Rivera Flores v. Puerto Rico Tel. Co.,* 776 F.Supp. 61, 67 (D.P.R.1991); *Turner v. First Hosp. Corp.,* 772 F.Supp. 284, 287 n. 2 (E.D.Va. 1991).

Having found that section 504 was enacted pursuant to the Spending Clause, I now survey the nature of Congress' spending power. In *Dole,* 483 U.S. at 206–07, 107 S.Ct. 2793, the Supreme Court acknowledged that incident to its power under Article I, Section 8 of the Constitution, Congress may attach conditions to the receipt of federal funds, thereby allowing Congress to reach objectives not within "Article I's enumerated legislative fields." (citations and quotation omitted). This creates a relationship of a contractual nature between Congress and the States. *See Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) ("*Pennhurst I* "). A valid exercise of Congress' Spending Clause power is dependent upon a State's knowing and voluntary acceptance of the "contractual" terms. *See id.* Thus, conditions on the grant of federal financial assistance must be stated unambiguously.[13] *See id.* "By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.*

The argument that Congress unequivocally stated its intention to solicit a waiver of the States' sovereign immunity through section 504 was rejected in 1985 by the Supreme Court in *Atascadero,* 473 U.S. at 246–47, 105 S.Ct. 3142. In *Atascadero,* the Supreme Court concluded that Congress failed to "manifest[ ] a clear intent to condition participation in the programs funded under [section 504] on a State's consent to waive its constitutional immunity." *Id.* at 245, 105 S.Ct. 3142. Thereafter, Congress enacted the following:

> A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, title IX of the Educational Amendments of 1972, and Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or the provision of any Federal statute prohibiting discrimination by recipients of Federal financial assistance.

---

**13.** There are other limitations on Congress' spending power: (1) Congress must act in pursuit of "the general welfare;" (2) "federal grants might be illegitimate if they are unrelated to the federal interest in particular national projects or programs;" and (3) other constitutional provisions may create an independent bar to the conditional grant of federal monies. *Dole,* 483 U.S. at 207–08, 107 S.Ct. 2793 (citations and quotations omitted). Defendants do not explicitly contend that section 504 violates any of these restrictions, but as discussed in this section, they do suggest that the second limitation invalidates the condition articulated in section 504.

42 U.S.C. § 2000d–7(a)(1) (1994) ("section 2000d–7(a)(1)"). In *Lane v. Pena*, 518 U.S. 187, 189, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996), the Supreme Court evaluated whether section 2000d–7(a)(1) unmistakably evidenced Congress' intent to waive the federal government's sovereign immunity to damages liability for violations of section 504. In examining this issue, the Court observed "the care with which Congress responded to our decision in *Atascadero* by crafting an unambiguous waiver of the States' Eleventh Amendment immunity." *Id.* at 200, 105 S.Ct. 3142. Several courts of appeals undertaking this inquiry following the enactment of section 2000d–7(a)(1) have reached similar results. *See, e.g., Jim C. v. United States*, 235 F.3d 1079, 1082 (8th Cir.2000) (holding that Arkansas' Department of Education waived its sovereign immunity for suit brought under section 504); *Stanley v. Litscher*, 213 F.3d 340, 344 (7th Cir.2000) (concluding that "the Rehabilitation Act is enforceable in federal court against recipients of federal largess"); *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 875–76 (5th Cir.2000); *Clark*, 123 F.3d at 1271 (finding that "the Rehabilitation Act includes an express waiver of Eleventh Amendment immunity which California accepted when it accepted Rehabilitation Act funds"). Therefore, I conclude that section 504 unambiguously expresses Congress' intent to condition the grant of federal funds on a States' consent to suit through section 2000d–7(a)(1).

Although the Defendants challenge the cases that Plaintiffs offer to support their contention that Congress' intent has been unambiguously manifested (Def. Reply at 9–12), they concede that Congress' expression of its intent in section § 2000d–7(a)(1) is "clear" as required by the Supreme Court. (Mot. to Dismiss at 18).

Defendants suggest that despite its clarity, section 2000d–7(a)(1) cannot serve as the basis for an effective waiver because it is not "program-specific," as it extends to "*any* claim arising under *any* program under § 504 *and* title IX *and* the Age Discrimination Act of 1975 *and* title VI *and* 'any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.'" (Mot. to Dismiss at 18) (emphasis in original) (quoting 42 U.S.C. § 2000d–7(a)(1)). Defendants provide the Court with no authority for the requirement that Congress state its intention to condition the receipt of federal funds on submission to suit on a program-by-program basis. As I have stated previously, and the Defendants concede, with regard to section 504, Congress' intent has been expressed unambiguously. No more is required.

Defendants argue that section 2000d–7(a)(1) cannot serve to effect a waiver in this particular case because there is an insufficient "connection between the granting of funds to a state for a certain purpose and the state's agreement to waive its immunity if sued on a related claim." (Def. Reply at 9). During oral argument, counsel for the defendants expounded on this argument:

> I think based on *Atascadero* there needs to be come (sic) kind of connection between the kinds of funds, the kind of case and the kind of waiver and the kind of lawsuit.

(Oral Arg. Trans. at 17, Apr. 26, 2001).

In support of this nexus requirement, Defendants rely on the Supreme Court's instruction in *Atascadero*: Congress must "manifest[ ] a clear intent to condition participation *in the programs funded under the Act* on a State's consent to waive its constitutional immunity," (Def. Reply at 9, 11 n. 6) (emphasis in original) (quoting

*Atascadero*, 473 U.S. at 247, 105 S.Ct. 3142).

To the extent Defendants assert that the condition imposed by Congress "must be related to the purpose of the federal funds whose receipt is conditioned," I agree with the reasoning of the District of Columbia Circuit, which rejected that argument, concluding that that "standard is not supported by the case law." *Oklahoma v. Schweiker*, 655 F.2d 401, 406–07 (D.C.Cir. 1981). After surveying the Supreme Court's pronouncements in this area, the court of appeals observed:

> In each of these cases, the condition imposed by Congress, and the behavior of the grant recipient that the condition was designed to affect, were not exactly correlated to the purpose for which the conditioned federal funds were dispensed: the conditions and the general funding programs were aimed at serving different federal interests. Nevertheless, the courts recognized that in each instance Congress had legitimately exercised its power to insist that those receiving federal benefits agree, in exchange, to abide by the condition set by Congress. In none of the cases did the courts require that Congress identify the relationship between the terms imposed and the purposes of the funding programs conditioned.

*Id.* at 407.

Defendants also point to the Supreme Court's observation in *Dole*, 483 U.S. at 207, 107 S.Ct. 2793, "that conditions on federal grants might be illegitimate if they are unrelated to the federal interest in particular national projects or programs." (quotation omitted). This requirement centers around the relationship between the condition imposed and the federal initiative. Through section 2000d–7(a)(1), Congress linked the federal government's legitimate interest in eliminating discrimi-

nation against disabled individuals in the programs it endows to State accountability for such discrimination. Similarly, the congressionally imposed condition in *Dole* requiring the States to raise their legal drinking ages to twenty-one was sufficiently related to the federal interest in safe interstate travel. *See Dole*, 483 U.S. at 208–09, 107 S.Ct. 2793.

After considering this requirement for permissible Spending Clause conditions, a federal district court in Kansas rejected an argument that encompasses at least part of the nexus requirement proposed by Defendants here. *See Robinson v. Kansas*, 117 F.Supp.2d 1124, 1133 (D.Kan.2000). In *Robinson*, 117 F.Supp.2d at 1127–30, minority, non-U.S. origin, and disabled students sued the state of Kansas and three state officials under, *inter alia*, Title VI, 42 U.S.C. § 2000d (1994), and section 504, claiming that its statutory scheme for funding schools has a discriminatory disparate impact on them. The Defendants argued that Congress could not properly condition the receipt of federal funds on the state's waiver of immunity under section 2000d–7(a)(1) because the funds alleged to be distributed in a discriminatory way were not the actual federal funds disbursed to the State under Title VI. *Id.* at 1133. The court in *Robinson* rejected this argument as to Title VI and section 504 ruling, "No dollar-for-dollar accounting need be made." *Id.* at 1133, 1134.

I reject Defendants' assertion and find that any nexus requirements of *Atascadero* and *Dole* have been satisfied.

Defendants also contend there can be no implied waiver because Congress' offer to exchange federal funds for compliance with section 504 is unduly coercive. As the Supreme Court admonished in *Dole*, 483 U.S. at 211, 107 S.Ct. 2793, and reiterated in *College Savings Bank*, 527 U.S. at 687, 119 S.Ct. 2219, "the financial induce-

ment offered by Congress might be so coercive as to pass the point at which 'pressure turns to compulsion.' " (quoting *Steward Machine Co. v. Davis,* 301 U.S. 548, 590, 57 S.Ct. 883, 81 L.Ed. 1279 (1937)).

A divided Eighth Circuit rejected this argument in *Jim C.,* 235 F.3d at 1081, concluding that with section 504, Congress has not crossed the line separating pressure and compulsion. Section 504 prohibits discrimination against a qualified individual with a disability by any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a). "Program or activity" is defined as the department or agency that receives or distributes the federal funds. *See* 29 U.S.C. § 794(b). Such receipt, however, does not affect other state agencies or the State as a whole. *See Jim C.,* 235 at 1081. "A State and its instrumentalities can avoid Section 504's waiver requirement on a piecemeal basis, by simply accepting federal funds for some departments and declining them for others." *Id.* At all times, the State has the option to accept federal funds, which it can choose to exercise or not. *See id.* at 1082 (recognizing that "[t]he State may take the money or leave it"). While the incentive at issue here may be a powerful and tempting one, it remains merely an offer.

Lastly, Defendants assert that there cannot be an effective waiver of immunity in the instant matter because the DPW's participation in federal programs such as the Medical Assistance Program predates the 1986 enactment of section 2000d–7(a)(1). This argument is unavailing for two reasons. First, Plaintiffs claims do not predate 1986. Second, the DPW accepts federal monies annually. Since the enactment of section 2000d–7(a)(1), the DPW has had the option to avoid being governed by the mandates of section 504. The DPW got what it bargained for. It cannot now avoid its obligation.

Therefore, for the above-stated reasons, I find that in this case the Eleventh Amendment is not a bar to suit in federal court for violations of section 504.

### 2. Congressional Abrogation under the ADA

Defendants argue that the DPW is immune from suit for violations of Title II of the ADA under the Eleventh Amendment.[14] Plaintiffs argue that their integration mandate claim (Count II) survives Eleventh Amendment scrutiny because Congress effectively abrogated the States' sovereign immunity in enacting Title II of the ADA.[15]

The Supreme Court recently held that suits for damages brought by state employees against the State alleging failure to comply with Title I of the ADA, which deals with discrimination in employment, are barred by the Eleventh Amendment. *See Garrett,* 121 S.Ct. at 960. The Court explicitly declined to decide this issue with regard to Title II, noting that there are differences between the remedial provisions of Title I and Title II.[16] *See id.* at 960 n. 1; *see also Lavia v. Comm. of*

---

**14.** Title II of the ADA states:
[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.
42 U.S.C § 12132 (1994).

**15.** Plaintiffs do not argue that their methods of administration claim under the ADA (Count

IV) survives Defendants' Eleventh Amendment challenge. Since the Plaintiffs did not favor the Court with briefing or arguments in support of this claim, I will dismiss Count IV against the DPW.

**16.** Because neither party addressed the implications of the Court's comment I will not consider them here.

*Pennsylvania,* 224 F.3d 190, 195 n. 2 (3d Cir.2000) (declining to address whether Congress had validly abrogated the immunity of the States with regard to Title II).[17]

A two-pronged test governs the court's analysis: First, I must consider whether Congress' intent to nullify the States' immunity was expressed unequivocally. *See Garrett,* 121 S.Ct. at 962; *Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). Second, I must determine whether Congress acted pursuant to a valid grant of constitutional authority. *See Garrett,* 121 S.Ct. at 962.

### a. Unmistakably clear congressional intent

With regard to the first prong, a legitimate abrogation requires that Congress make "its intention unmistakably clear in the language of the statute." *Id.* (quotations omitted). Section 12202 of the ADA provides:

A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter.

42 U.S.C. § 12202 (1994). The Third Circuit has recognized that Congress has "unequivocally fulfilled the first requirement by expressly stating its intent to abrogate the states' Eleventh Amendment immunity." *Lavia,* 224 F.3d at 196. The Defendants do not dispute that Congress has clearly expressed its intent. (Mot. to Dismiss at 12).

### b. Validity of Title II under § 5 of the Fourteenth Amendment

I now turn to the second part of this "simple but stringent test." *Lavia,* 224

F.3d at 196 (quoting *Dellmuth v. Muth,* 491 U.S. 223, 228, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989)). It is well established that Congress can properly abrogate the sovereign immunity of the States only when acting pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment. *See Garrett,* 121 S.Ct. at 962. Pursuant to § 5, Congress is vested with the authority to enact legislation to enforce § 1 of the Fourteenth Amendment, which, *inter alia,* guarantees individual freedom from State deprivation of life, liberty, or property without due process of law and State denial of equal protection of the laws. *See id.* at 963 (citation omitted); U.S. CONST., amend XIV, § 1. Congress' enforcement power encompasses "the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." *Id.* While Congress holds enforcement authority, it is within the purview of the courts to identify the substantive scope of constitutional guarantees. *See id.; Kimel v, Fla. Bd. of Regents,* 528 U.S. 62, 81, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000).

### i. Defining the constitutional right

■ I begin here, as the Supreme Court did in *Garrett,* by identifying the scope of the constitutional right at issue. *See id.* Plaintiffs posit that the Due Process Clause of the Fourteenth Amendment confers a substantive right to community-based services for disabled individuals when recommended by qualified professionals.[18] According to the Plaintiffs, this

---

**17.** Prior to the Court's decision in *Garrett,* some courts of appeals concluded that Congress had effectively abrogated the States' immunity to suit under Title II. *See, e.g., Coolbaugh v. Louisiana,* 136 F.3d 430 (5th Cir.),

*cert. denied,* 525 U.S. 819, 119 S.Ct. 58, 142 L.Ed.2d 45 (1998); *Clark,* 123 F.3d at 1269.

**18.** Defendants urge the Court to decline to entertain this argument citing a decision of

right grew out of the Supreme Court's decision in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) and the Third Circuit's decision in *Clark v. Cohen*, 794 F.2d 79 (3d Cir.), *cert. denied*, 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 404 (1986). In *Youngberg*, 457 U.S. at 316, 102 S.Ct. 2452, the Supreme Court recognized that an individual who is involuntarily committed to a psychiatric institution retains a liberty interest in freedom from bodily restraint. But this constitutional right is not absolute. It is limited "to the extent professional judgment deems [bodily restraint] necessary to assure [ ] safety or provide needed training." *Id.* at 324, 107 S.Ct. 708. The Court also concluded that those committed to institutions are entitled to minimally adequate training, defined as training that is "reasonable in light of the individual's liberty interests in safety and freedom from unreasonable restraints." *Id.* at 322, 107 S.Ct. 708. Courts are to be guided by the judgment of a qualified professional in determining what is reasonable. *Id.; see Thomas S. v. Flaherty*, 699 F.Supp. 1178, 1199 (W.D.N.C.1988) (noting that the "constitutional right of class members to treatment comporting with the judgment of qualified professionals is established" in analyzing the substantive due process rights of mentally retarded adults in public psychiatric institutions under *Youngberg* ), *aff'd*, 902 F.2d 250 (4th Cir.), *cert. denied*, 498 U.S. 951, 111 S.Ct. 373, 112 L.Ed.2d 335 (1990).

In *Clark*, 794 F.2d at 87, the Third Circuit affirmed the trial court's holding that Ms. Clark's involuntary confinement in a psychiatric institution "in the face of unanimous professional opinion that she be placed in a far less restrictive environment violated her substantive liberty right to appropriate treatment[,]" in that case, placement in a community living arrangement. (citation omitted). The court of appeals agreed with the trial court that Ms. Clark was constitutionally entitled to the training required for community living. *See id.* Some courts have ruled that this substantive liberty interest encompasses the right to treatment consistent with the judgment of qualified professionals whose recommendations are not affected by funding issues. *See Thomas S.*, 699 F.Supp. at 1200 (quotation omitted) (finding that the constitutional rights of those confined in mental institutions include entitlement to "treatment recommended by qualified professionals whose judgment is unsullied by consideration of the fact that the state does not provide appropriate treatment or funding for appropriate treatment"); *Clark*, 613 F.Supp. at 704 n. 13 ("I do not believe that the *Youngberg* court meant to include decisions motivated out of budgetary constraints in the category of 'professional judgment' ").

Defendants correctly observe that cases decided after *Youngberg* and *Clark* limit Plaintiffs' argument by clarifying that the substantive due process rights that Plaintiffs seek to assert here are not held by

the Third Circuit in which the court opted not to consider an alternative basis of congressional authority for the enactment of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601–54 (1994 & Supp. IV 1998), because Congress had explicitly relied on the Equal Protection Clause. (Def. Reply at 14–15) (citing *Chittister v. Dept. of Cmty. and Econ. Dev.*, 226 F.3d 223, 228 (3d Cir. 2000)). With regard to the ADA, Defendants point me to 42 U.S.C. § 12101 (1994), which

contains no reference to the Equal Protection Clause. Instead, section 12101(b) makes a broader reference to the Fourteenth Amendment. To the contrary, in enacting FMLA, Congress stated its specific intent to "accomplish [its] purposes [ ] in a manner that, consistent with the Equal Protection Clause of the Fourteenth Amendment, minimizes the potential for employment discrimination on the basis of sex …" 29 U.S.C. § 2601(b)(4).

individuals whose institutionalization is voluntary. The Court's holding in *Youngberg* applies to individuals who are committed against their will. *See DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 199, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). "In the substantive due process analysis, it is the States's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause." *Id.* at 200, 109 S.Ct. 998. The imposition of constitutional obligations arose in *Youngberg* because of the "patient's involuntary commitment and total dependence on his custodians." *County of Sacramento v. Lewis*, 523 U.S. 833, 852 n. 12, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). In *Fialkowski v. Greenwich Home for Children, Inc.*, 921 F.2d 459, 464 (3d Cir.1990), the Third Circuit concluded that no Fourteenth Amendment violation occurred when a mentally retarded individual choked to death at a community living arrangement in which he was voluntarily placed because he was not deprived of his freedom under *DeShaney*.

Here, Plaintiffs Frederick L. and Steven F. are committed to NSH on a voluntary basis. (First Am. Compl. at ¶¶ 20, 41). Consequently, they have no substantive due process right to community-based services. Accordingly, Count II against the DPW is dismissed with regard to Frederick L. and Steven F.[19]

■ With regard to Plaintiffs Nina S. and Kevin C., who I will infer remain involuntarily committed (as I must at this stage), Defendants argue that involuntarily committed individuals with mental disabili-

ties do not have a substantive due process right to community placement even when it is professionally recommended. (Def. Reply at 17). Defendants rely primarily on the Third Circuit's ruling in *Philadelphia Police and Fire Association for Handicapped Children, Inc. v. City of Philadelphia*, 874 F.2d 156 (3d Cir.1989). In *Philadelphia Police and Fire*, the court of appeals determined that the substantive due process rights of mentally retarded persons living at home were not violated when the city of Philadelphia reduced the services it would provide to them because of budgetary shortages. *See id.* at 158, 160. *Philadelphia Police and Fire* did not involve institutionalized individuals. In contrast, Nina S. and Kevin C. are being institutionalized involuntarily.

The instant situation appears to be governed by *Clark*. Defendants attempt to distinguish *Clark* by noting that Ms. Clark may not have needed government services at all. Here, as the Defendants correctly observe, Nina S. and Kevin C. need mental health services. This distinction ignores the critical similarity: Ms. Clark was and Nina S. and Kevin C. are institutionalized against their will. The courts in *Youngberg* and *Clark* have recognized, as this Court recognizes today, that a State that involuntarily institutionalizes an individual is saddled with certain constitutional obligations, in this context, the right to appropriate treatment as determined by qualified professionals (perhaps professionals who are not influenced by budgetary concerns). The Defendants cite no cases, nor am I aware of any cases, that abridge the scope of the constitutional rights asserted here with regard to Nina S. and Kevin C.

Not all forays by the States into areas of important human rights rise to the level of

---

**19.** Plaintiffs argue that the constitutional right at issue is one sounding in substantive due process. They decline to claim any other constitutional right. Having considered the constitutional right asserted by the Plaintiffs, my evaluation ends.

constitutional violations. There must be a balance between the interest of the States in regulating certain areas of human life and the interest of individuals in remaining free from governmental interference. State conduct with regard to the mentally disabled is constitutional if the State's actions "bear[ ] any rational relationship to any interest the state may legitimately promote."[20] *Stern v. Halligan*, 158 F.3d 729, 731 (3d Cir.1998); *see Garrett*, 121 S.Ct. at 964; *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In this context, the DPW may deny community-based services to Plaintiffs who are deemed appropriate for such services if the DPW's actions are rational. The State is not obligated to articulate the reasons for its policy decisions at the time that they are made. *See id.* at 964. The challenging party must bear the heavy burden of negating any reasonably conceivable rational basis for the DPW's actions. *See id.* For example, the Court in *Garrett* noted in the context of Title I that the conservation of scarce financial resources is an entirely rational, and thereby constitutional, reason for a state employer to hire individuals who do not have disabilities that prevent them from using existing facilities over disabled individuals who could perform the job with accommodations. *See Garrett*, 121 S.Ct. at 966.

### ii. Congruence and proportionality

As rehearsed above, Congress is empowered to enact legislation reaching conduct that is not prohibited by § 1 of the Fourteenth Amendment in order to deter violations of the rights guaranteed by § 1. In so doing, Congress cannot dissolve the sovereign immunity of the States for suits involving alleged violations of its legislation unless the "congruence and proportionality" test is satisfied. *Id.* at 963.

Valid § 5 legislation requires the congressional identification of a "history and pattern" of conduct on the part of the States that transgresses the Fourteenth Amendment's substantive provisions and a legislative scheme tailored to remedying such conduct. *Id.* at 964; *see Lavia*, 224 at 197 (quotation omitted). If Title II is an effort to substantively redefine the constitutional right at issue here, it is not appropriate prophylactic legislation. *See Kimel*, 528 U.S. at 81, 120 S.Ct. 631.

In enacting the ADA, Congress specifically found that individuals with mental disabilities are isolated and segregated. *See* 42 U.S.C. § 12101(a)(2), (5). Congress observed that "discrimination against individuals with disabilities persists in such critical areas as ... institutionalization." 42 U.S.C. § 12101(a)(3). Congress set forth "the Nation's proper goals regarding individuals with disabilities," including "full participation, independent living, and economic self-sufficiency." 42 U.S.C. § 12101(a)(8). While it is clear that Congress sought to remedy the segregation of individuals with disabilities, Congress did not specifically note, in statutory text, discriminatory conduct on the part of the States.

In determining whether a particular statutory enactment is appropriate legislation under § 5, the Supreme Court has examined the legislative record. *See Kimel*, 528 U.S. at 88, 120 S.Ct. 631. In crafting the ADA, Congress had before it a report issued by the United States Commission on Civil Rights entitled *Accommodating the Spectrum of Individual Abili-*

---

[20]. A heightened level of scrutiny is appropriate where a fundamental right is being restricted. The Plaintiffs do not allege that any fundamental right is at issue here. I am not aware of any Supreme Court pronouncement of a fundamental right relevant in this context.

*ties.* In a chapter describing "ongoing and historical handicap discrimination" under a section devoted to institutionalization, the Commission specifically referenced "public institutions," writing:

There has been increasing acceptance in recent years of the fact that most training, treatment, and habilitation services can be better provided to handicapped people in small, community-based facilities rather than in large, isolated institutions. Professionals, courts, Congress and more than one President have called for "deinstitutionalization" and the development of appropriate community programs. Because of such official reorientation toward community alternatives and a variety of other factors (such as the emergence of new service philosophies among human service professionals and the development of drug therapies and other novel treatment approaches), the number of handicapped persons in residential facilities has dwindled in the past two decades.

Despite such initiatives, a great many handicapped persons remain in segregative facilities. The Comptroller General has estimated that about 215,500 persons were residing in public mental hospitals in 1974 and that some 181,100 persons were in public institutions for mentally retarded people as of 1971. In 1976 one study estimated that 1,550,120 persons were in long term residential care facilities.

United States Commission on Civil Rights, *Accommodating the Spectrum of Individual Abilities,* 34–35 (1983) (footnotes omitted). The Commission recognized that institutions continue to be "instruments of segregation." *Id.* at 33. Additionally, in urging the passage of the ADA, Congressman Miller observed that "[s]ociety has made [people with disabilities] invisible by shutting them away in segregated facili-

ties." 136 Cong. Rec. H2447 (daily ed. May 17, 1990) (statement of Rep. Miller).

The congressional record reveals that in enacting the ADA Congress was concerned about the segregation of individuals with disabilities in institutions. Moreover, while Congress did not specifically reference misconduct by the States, it did note discrimination associated with institutions, which are commonly state-operated facilities. While I think this case presents a close call, I cannot, against the backdrop of *Kimel* and *Garrett,* find that Congress sufficiently identified a "history and pattern" of unconstitutional discrimination by the States.

In *Kimel,* 528 U.S. at 67, 120 S.Ct. 631, the Supreme Court concluded that Congress exceeded its authority under § 5 in abrogating the Eleventh Amendment with regard to the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, *et seq.* In enacting the ADEA, Congress made findings comparable to those it made in enacting the ADA. Without identifying the State as a culprit, Congress found that older workers are disadvantaged in retaining and regaining employment. *See* 29 U.S.C. § 621(a)(1) (1994). After examining the legislative record, which included charges of discrimination by government employers, the Court determined that "evidence consist[ing] almost entirely of isolated sentences clipped from floor debates and legislative reports" is insufficient to establish a pattern of unconstitutional discrimination by the States. *Kimel,* 528 U.S. at 89, 120 S.Ct. 631.

In concluding that the States' immunity to suit was not properly abrogated through Title I, the Court in *Garrett* considered the finding of Congress contained in 42 U.S.C. § 12101(a)(2) and the record assembled by Congress which included descriptions of incidents to support Congress' finding.

*See Garrett,* 121 S.Ct. at 965. The Court determined that the misconduct identified by Congress was not sufficient because it did not reflect misconduct by the States and it was not clear that the misconduct identified was unconstitutional. *See id.* at 965. In reviewing the congressional record, the Court noted that "the great majority" of the incidents described therein did not involve State activities. *See id.* Given the number of individuals employed by the State, the Court emphasized the lack of attention paid to the States by Congress. *See id.* at 965–66. "[I]f Congress had truly understood [the] information [before it to reflect] a pattern of unconstitutional behavior by the States, one would expect some mention of that conclusion in the Act's legislative findings." *Id.* at 966. Moreover, because the incidents of State action that did exist were taken out of context, it was not clear that the conduct described was irrational. As summarized by the Third Circuit in finding that Congress' attempted abrogation of Title I was ineffective, "[w]ithout more detailed findings concerning a nationwide pattern of arbitrary and illegitimate discrimination against the disabled by the states, the ADA cannot be viewed as a proportional and congruous response to the problem of state-perpetrated discrimination against the disabled. While the ADA's goal of eliminating discrimination may be a laudable aim for federal legislation, it is not one which serves the purpose of enforcing the protections provided by the Fourteenth Amendment." *Lavia,* 224 F.3d at 205.

Similarly, while I have not been provided with a figure, the number of individuals with disabilities in state-operated institutions is certainly significant. Yet, absent from the ADA's legislative findings with regard to institutionalization is any reference to transgressions on the part of the States. Furthermore, what is lacking here in Congress' bald and generalized conclusions regarding the treatment of the disabled is enough context to determine whether the referenced conduct is irrational and therefore unconstitutional.

Even if I were to find that Congress successfully documented a "history and pattern" of unconstitutional discrimination by the States, Plaintiffs would still have to overcome "congruence and proportionality" concerns regarding the rights and remedies created by Title II, which, with other statutes, have not easily been alleviated. *See generally, Garrett,* 121 S.Ct. at 966–68; *Kimel,* 528 U.S. at 82–83, 120 S.Ct. 631; *City of Boerne v. Flores,* 521 U.S. 507, 533, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (finding that Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb (1994), *et seq.,* lacks congruence and proportionality).

In considering the narrow issue of whether Title II represents a valid congressional abrogation of the States' immunity to actions brought against a State child welfare agency based on its policy of separating HIV-positive newborns from their HIV-positive mothers when the mother refuses to consent to treatment, a district court in New Jersey concluded that Congress exceeded its authority under § 5 by placing on the States, *inter alia,* the affirmative duty to modify rules, policies and practices to accommodate the disabled, *see* 42 U.S.C. § 12131(2), a duty which is not constitutionally required. *See Doe v. Div. of Youth and Family Servs.,* 148 F.Supp.2d 462, 489 (D.N.J.2001). As the implementing regulation explains, "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the ser-

vice, program, or activity." 28 C.F.R. § 35.130(b)(7) (2000).

This obligation far surpasses what is constitutionally mandated in the instant matter as well. State public welfare agencies are not constitutionally required to undergo a comprehensive modification of their rules, policies, and practices in order to accommodate all disabled individuals. While the Constitution does in some instances require that the State act rationally in providing appropriate care, this right is held by disabled individuals who are involuntarily institutionalized, not all disabled individuals. Even with regard to involuntarily institutionalized individuals, enforcement of the substantive due process right asserted here by the Plaintiffs may require modification of State policies that irrationally interfere with the provision of treatment recommended by professionals, but the Constitution does not require the State to make all modifications necessary to prevent discrimination.

I am therefore compelled to dismiss Count II against the DPW as to Plaintiffs Nina S. and Kevin C.

### B. Defendant Houstoun's amenability to suit under the ADA and section 504

█ Defendants argue that because Houstoun is not a proper defendant under Title II of the ADA (Counts II and IV)

and section 504 (Counts I and III) she cannot be properly sued in her official capacity as Secretary of the DPW under the doctrine articulated by the Supreme Court in *Ex parte Young*, 209 U.S. 123, 159–60, 28 S.Ct. 441, 52 L.Ed. 714 (1908), which generally allows private individuals to seek prospective injunctive relief in federal court against state officials for violations of federal law. *See Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985).

Defendants contend that because Title II of the ADA and section 504 direct their prohibitions to a "public entity" and "any program or activity receiving Federal financial assistance," respectively, individuals cannot be proper defendants. Defendants urge me to adopt the reasoning of the district court in the District of New Mexico in *Lewis v. New Mexico Dept. of Health*, 94 F.Supp.2d 1217 (D.N.M.2000). In *Lewis*, individuals who were eligible to participate in Medicaid and an agency that advocates for the rights of people with disabilities sued two state officials in their official capacities, asserting several claims, including one brought under the ADA. *Id.* at 1221–22. The court concluded that the Plaintiffs could not properly invoke section 1983 to enforce the ADA against the state officials because "Title II claims cannot be maintained against individual defendants." [21] *Id.* at 1230.

---

**21.** The court's decision in *Lewis* was rendered prior to the Supreme Court's decision in *Garrett*. Similarly, in other cases cited by Defendants and decided before *Garrett*, the court reached the same result as the court in *Lewis*. *See, e.g., Walker v. Snyder*, 213 F.3d 344, 347 (7th Cir.2000) (claim based on *Ex parte Young* must be dismissed where individuals are sued in their official capacities in an action brought under Title II). I note, however, that a district court in Illinois recognized the questionable vitality of the Seventh Circuit's holding in *Walker* in the aftermath of *Garrett*. *See*

*Boudreau v. Ryan*, No. 00–5392, slip op. at 14 n. 5, 2001 WL 840583 (N.D.Ill. May 2, 2001).

Other cases cited by Defendants are inapposite here. For example, in *Hallett v. New York State Dept. of Correctional Servs.*, 109 F.Supp.2d 190, 200 (S.D.N.Y.2000), the court dismissed the plaintiff's ADA and section 504 claims against individual defendants in their official capacities without deciding the issue I must confront here. After noting that some courts have distinguished between persons sued in their individual and official capacities, the court in *Hallett* opted to dismiss the plain-

The Supreme Court's decision in *Garrett*, however, leads me to a contrary result. The Supreme Court recently acknowledged that Title I of the ADA,[22] dealing with employment discrimination, "still prescribes standards applicable to the States" which can be enforced in actions against state officials for injunctive relief under *Ex parte Young*.[23] *Garrett*, 121 S.Ct. at 968 n. 9, *accord State Police for Automatic Ret. Ass'n v. Difava*, 138 F.Supp.2d 142, 146–47 (D.Mass.2001) (noting Supreme Court's comments in *Garrett* and ruling that the Age Discrimination in Employment Act is enforceable under *Ex parte Young*). Although the Defendants correctly characterize the Court's comments as dicta, "we must consider [the dicta] with deference, given the High Court's paramount position in our 'three-tier system of federal courts.'" *Alston v. Redman*, 34 F.3d 1237, 1246 (3d Cir.1994) (quotation omitted).

Defendants may be correct to the extent they argue that, as a general matter, suits brought against individuals in their individual capacities are not properly brought under the ADA or section 504. *See Alsbrook v. Maumelle*, 184 F.3d 999, 1005 n. 8 (8th Cir.1999) (state officials cannot be sued under Title II in their individuals capacities); *Doe*, 148 F.Supp.2d at 489 (D.N.J. June 25, 2001) (finding no individual liability under Title II); *J.F. v. Sch. Dist. of Philadelphia*, 2000 WL 361866, at *17 (E.D.Pa. Apr. 7, 2000) (section 504 does not permit individual liability); *Callo-way v. Boro of Glassboro Dept. of Police*, 89 F.Supp.2d 543, 556 (D.N.J.2000) (individuals are not proper defendants under Title II and section 504); *Yeskey v. Comm. of Pa.*, 76 F.Supp.2d 572, 575 (M.D.Pa. 1999) (individuals are not liable under Title II); *Fitzpatrick v. Comm. of Pa. Dept. of Transp.*, 40 F.Supp.2d 631, 638 (E.D.Pa. 1999) (section 504 does not provide for individual liability). *But see, Guckenberger v. Boston Univ.*, 957 F.Supp. 306, 323 (D.Mass.1997) (individual who has the authority to accept or reject federal funds can be liable under the Rehabilitation Act); *Lee v. Trs. of Dartmouth–Hitchcock Medical Center*, 958 F.Supp. 37, 45 (D.N.H. 1997) (individual who violates Rehabilitation Act can be personally liable if he or she is in a position to accept or reject federal funds); *Niece v. Fitzner*, 922 F.Supp. 1208, 1219 (E.D.Mich.1996) (prison officials sued in their individual capacities are proper defendants under Title II).

Here, however, Houstoun is being sued in her official capacity. This distinction makes all the difference. *See Randolph v. Rodgers*, 253 F.3d 342, 348–49 (8th Cir. 2001) (affirming the district court's conclusion that plaintiff's action seeking prospective injunctive relief may proceed under *Ex parte Young* against a state official in her official capacity for violations of ADA and section 504); *Berthelot v. Stadler*, 2000 WL 1568224, at *2, *3 (E.D.La. Oct. 19, 2000) (dismissing suits brought against prison officials and employees in their indi-

---

tiff's claim against the individual defendants since it found that the Eleventh Amendment did not bar suit against the state. *Id.* at 199–200. "Because plaintiff is able to assert his ADA and Rehabilitation Act claims against [the New York State Department of Correctional Services] directly, I find that there is no justification for allowing plaintiff to also assert ADA and Rehabilitation Act claims against individual defendants in their official capacities." *Id.* at 200.

**22.** I note that Title I regulates the conduct of a "covered entity." 42 U.S.C. § 12112(a). The definition of "covered entity" includes "employment agency, labor organization, or joint labor-management committee." 42 U.S.C. § 12111(2).

**23.** The Court also observed that suits seeking money damages can be brought by the United States against the States. *Garrett*, 121 S.Ct. at 968 n. 9.

vidual capacities under Title II and section 504 while finding those claims against individuals in their official capacities are cognizable).

Because the Defendants do not dispute that, notwithstanding their argument that Houstoun is not amenable to suit under the ADA and section 504, Houstoun can be properly sued under *Ex parte Young*,[24] I conclude my examination of this issue here and find that suit is appropriately brought under Title II of the ADA against a state official in her official capacity in the context of *Ex parte Young*.[25] This conclusion extends with equal force to section 504.

### C. Section 1983 (Count V)

■ Plaintiffs bring suit against Defendant Houstoun in her official capacity, charging that she violated section 1983 by establishing "a policy and practice of the Department of Public Welfare to refuse and fail to provide mental health services to Plaintiffs and the class they represent in the most integrated setting appropriate to their individual needs in violation of both the ADA and Section 504." (First Am. Compl. at ¶ 88). The Defendants claim that section 1983 may not be used to enforce section 504 or the ADA. Although Defendants concede that Houstoun may

properly be sued under section 1983 as a general matter, they argue that suit in this instance has been congressionally foreclosed. (Mot. to Dismiss First Am. Compl. at 3).

Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

Suit brought under section 1983 is an appropriate vehicle through which to redress violations of federal statutes as well as constitutional violations. *See generally Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). Although "the coverage of the statute must be broadly construed," *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 105, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989),

---

**24.** Defendants state: "Notwithstanding the Eleventh Amendment, State officials who are alleged to have acted contrary to federal law may be sued in their official capacities for prospective injunctive relief. In this case, plaintiffs seek (only) such relief from Secretary Houstoun. To this limited extent, the Eleventh Amendment is not a bar to plaintiffs' claims, but . . ., even if the Eleventh Amendment does not limit Plaintiffs' ability to pursue their particular claims against Secretary Houstoun, plaintiffs' claims against her cannot go forward for other reasons." (Mot. to Dismiss at 7 n. 3) (internal citation omitted). Such "other reasons" include Defendants' contentions that: (1) Houstoun cannot properly be sued under the ADA and section 504, addressed in this section; (2) Section 504 does not obligate the States to provide com-

munity care, addressed in Section III.D., *infra;* and (3) *Olmstead* limits Plaintiffs' claims, addressed in Section III.F., *infra*.

**25.** Defendants point to my decision in *Moyer v. Conti*, 2000 WL 1478791 (E.D.Pa. Oct. 10, 2000), a case brought under Title II. In that case, decided prior to *Garrett*, I granted summary judgment in favor of the state official defendant after finding that the plaintiff could not open the doors to the federal courts through *Ex parte Young*. *Id.* at *7. The plaintiff in that case failed to show that there was a question of material fact as to whether the state official violated the ADA. *Id.* I confront a different set of circumstances on a different procedural landscape here.

section 1983 is not available for enforcement of every federal law, *see Livadas v. Bradshaw,* 512 U.S. 107, 132, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994). Section 1983 is unavailable if: (1) Congress forecloses such enforcement of the particular statute or (2) the statute creates no enforceable rights, privileges or immunities, as defined by section 1983. *See Suter v. Artist M.,* 503 U.S. 347, 355, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992) (quoting *Wright v. Roanoke Redevelopment and Hous. Auth.,* 479 U.S. 418, 423, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987)).

Since the Defendants do not dispute that both section 504 and the ADA meet the first part of the test, I will turn to a determination of whether Congress has foreclosed enforcement of either section 504 or the ADA through section 1983. The Defendants do not (and cannot) make the argument that Congress expressly precluded the use of section 1983 actions to enforce section 504 or the ADA. Thus, I begin by analyzing whether Congress has precluded Plaintiffs' section 1983 claim by providing a "comprehensive enforcement mechanism" for section 504 or the ADA. *Golden State Transit Corp.,* 493 U.S. at 105–06, 110 S.Ct. 444 (quotation omitted); *see W.B. v. Matula,* 67 F.3d 484, 493 (3d Cir.1995). In so doing, I am mindful of the Supreme Court's admonishment in *Golden State Transit:*

> The availability of administrative mechanisms to protect the Plaintiff's interests is not necessarily sufficient to demonstrate that Congress intended to foreclose a § 1983 remedy. Rather the statutory framework must be such that allowing a Plaintiff to bring a § 1983 action would be inconsistent with Congress' carefully tailored scheme. The burden to demonstrate that Congress has expressly withdrawn the remedy is on the Defendant. We do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right.

*Golden State Transit Corp.,* 493 U.S. at 106–07, 110 S.Ct. 444 (internal citations and quotations omitted).

Defendants make no reference to any comprehensive enforcement mechanism, such as administrative processes,[26] whose circumvention through section 1983 might have been of concern to Congress. In support of their argument, Defendants observe only that "numerous courts" have ruled that section 1983 is unavailable in this context and provide a list of six federal cases, none of which, if applicable, would control my decision here. (Mot. to Dismiss First Am. Compl. at 3–4). In response, Plaintiffs list cases in which courts have reached a contrary result. Plaintiffs provide other evidence of congressional intent to permit enforcement of the ADA and section 504 through section 1983. In addressing the relationship between the ADA and other laws, Congress stated:

> Nothing in this chapter shall be construed to invalidate or limit the remedies, rights, and procedures of any federal law ... that provides greater or equal protection for the rights of individ-

---

**26.** The remedies available under Title II of the ADA stand in contrast to the remedial scheme established under Title I.

The enforcement provision of Title II of the ADA ... incorporates ... the remedies provision of the Rehabilitation Act. The appropriate remedy under the Rehabilitation Act depends on the status of the Plaintiff. Em-

ployees and applicants for employment ... are subject to the subsection of the ADA that ... incorporates the remedies of Title VII of the Civil Rights Act of 1964 ... [Those] remedies are highly detailed and constitute a comprehensive remedial scheme.

*Randolph v. Rodgers,* 253 F.3d 342, 2001 WL 641559, at \*3 (8th Cir. June 12, 2001).

uals with disabilities than are afforded by this chapter.

42 U.S.C. § 12201(b). In discussing the enforcement of section 504 and the ADA, the House Committee on the Judiciary reported that "the ADA does not preempt other applicable laws that include equal or greater protection. For title II, like Section 504 of the Rehabilitation Act, this includes remedies available under 42 U.S.C. § 1983 and under state law claims." H.R.Rep. No. 101–485, pt. 3, at 52 (1990).

Because the Defendants have not fulfilled their burden of establishing that Congress intended to foreclose relief through section 1983, I cannot make such a finding. Moreover, as the legislative history reveals, it seems that Congress in fact intended to permit redress of ADA and section 504 violations through section 1983.

### D. States' obligations under Section 504

■ Defendants assert that Plaintiffs cannot proceed under section 504 because it does not obligate the States to provide care to Plaintiffs in the community, the most integrated setting appropriate to their needs.

In enacting section 504, Congress intended to provide for the integration of handicapped persons into mainstream society. The legislative history of the provision contains expressions of this goal. *See, e.g.,* 118 CONG.REC. S3320 (statement of Sen. Williams) (section 504 was intended to "achieve the tragically overdue goal of full integration of the handicapped into normal community living, working, and service patterns"). The purpose of section 504 has been confirmed by Congress since its enactment. *See, e.g.,* S.REP. No. 95–890, at

39 (1978) (in adopting section 504, "Congress has made a commitment to the handicapped that, to the maximum extent possible, they shall be fully integrated into the mainstream of life in America"); 135 CONG. REC. S8507 (statement of Sen. Harkin) ("One of the precepts of section 504 is that segregation of people with disabilities will not be tolerated").

Section 504 was enacted without a provision authorizing rulemaking. *See Clark,* 613 F.Supp. at 691. In 1976, however, President Ford signed an executive order vesting the secretary of the Department of Health, Education, and Welfare[27] with the authority to promulgate regulations for the enforcement of section 504. *See id.* In 1981, that task was given to the Department of Justice. *See United States Dept. of Trans. v. Paralyzed Veterans of Am.,* 477 U.S. 597, 612 n. 14, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986). One section 504 regulation, which became effective in 1981, states:

> Recipients [of federal funds] shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons.

28 C.F.R. § 41.51(d) (2000). In *Makin v. Hawaii,* 114 F.Supp.2d 1017, 1035–36 (D.Haw.1999), a district court in Hawaii recognized the integration mandate of section 504 through interpretation of 28 C.F.R. § 41.51(d).

Guided by a regulation promulgated under the ADA, 28 C.F.R. § 35.130(d), *inter alia,* the Third Circuit recognized "unnecessary segregation as a form of illegal segregation against the disabled" under Title II of the ADA. *Helen L. v. DiDario,* 46 F.3d 325, 333 (3d Cir.1995). In so doing, the court of appeals noted that 28

---

**27.** The Department of Health, Education, and Welfare is now the Department of Health and Human Services. *See Clark,* 613 F.Supp. at 691.

C.F.R. § 35.130(d) is "almost identical" to 28 C.F.R. § 41.51(d).[28] *Id.* at 332. *See Kathleen S. v. Dept. of Pub. Welfare,* 10 F.Supp.2d 460, 468, 476 (E.D.Pa.1998) (noting similarity between 28 C.F.R. § 35.130(d) and 28 C.F.R. § 41.51(d) in finding that the denial of community placement where it is the most integrated setting appropriate violates the ADA's integration mandate). ADA regulation 28 C.F.R. § 35.130(d) provides:

> A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.

Defendants suggest that my decision here is controlled by the Supreme Court's decision in *Olmstead v. L.C.,* 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999), and the Third Circuit's decision in *Clark,* 794 F.2d at 85 n. 3, in which the courts decline to recognize an integration mandate in section 504. With regard to *Olmstead,* I find to the contrary. In *Olmstead,* 527 U.S. at 587, 119 S.Ct. 2176, the Supreme Court recognized the "qualified" right of individuals with mental disabilities to community placement under Title II of the ADA. In so doing, the Court looked to 28 U.S.C. § 35.130(d), a regulation "modeled on" 28 U.S.C. § 41.51(d).[29] *Id.* at 592, 119 S.Ct. 2176. The Defendants point to the fact that the Court commented that in enacting the ADA, Congress made explicit findings regarding the "unjustified segregation" of the disabled, findings Congress did not make in enacting section 504. *Id.* at 600 n. 11, 119 S.Ct. 2176. The Court's observation is inapposite here.

In *Clark,* 794 F.2d at 81, the defendants appealed the issuance of an injunction directing that Ms. Clark, who was confined in a state-operated institution caring for individuals who are mentally retarded, be released and provided with certain community services. On appeal, the Third Circuit was confronted with two questions: (1) whether the Eleventh Amendment bars any relief other than release from the institution and, alternatively, (2) whether any relief was appropriate because Clark's constitutional rights were not violated. *See id.* at 82. The court determined that the district court's finding that "Clark failed to prove that she was discriminated against on the basis of her handicap" was not clearly erroneous. *Id.* at 85 n. 3. The court also noted, without discussion of 28 U.S.C. 41.51(d), that section 504 "imposes no affirmative obligations on the states to furnish services." *Id.* I do not read this footnoted comment as a holding by the Third Circuit that section 504 does not obligate the States to provide community placement for individuals with mental disabilities where appropriate. In 1995, the Third Circuit explained that in *Clark,* "we were not concerned … with the integration mandate of the ADA or the Rehabilitation Act." *Helen L.,* 46 F.3d at 334.

Defendants argue that even if this Court were to determine that section 504 does require community placement where appropriate, the States could not have been aware that they were undertaking an obligation to provide treatment in the most integrated setting as a condition of their acceptance of federal funds because of the unsettled nature of the law in this area.[30]

---

**28.** The requirements of section 504 regulation 28 C.F.R. § 41.51(d) and ADA regulation 28 C.F.R. § 35.130(d) will be referred to collectively as the "integration mandate."

**29.** I note that the Court declined to rule on the validity of the regulations recited as the petitioners were not challenging them as outside the congressional authorization. *See Olmstead,* 527 U.S. at 592, 119 S.Ct. 2176.

**30.** As discussed in Section III.A.1., *supra,* Congress, pursuant to its Spending Clause power, can impose conditions on the receipt

Defendants' argument on this issue is without merit. *Dole, Pennhurst I,* and their progeny require that Congress clearly state its intention to condition the receipt of federal funds on compliance with a particular statutory scheme. As I observed in Section III.A.1., *supra,* Congress has successfully done so with section 504. Thus, the States knew that if they opted to accept federal monies they would be required to comply with the requirements of section 504 as defined by the legislature and interpreted by the courts. Moreover, as noted above, the legislative history indicates that the integration mandate was part of the original bargain.

I note that Defendants' argument is subject to an internal limitation. Even if I were to accept the Defendants' suggestion that the so called "integration mandate" was not clearly expressed when section 504 was enacted, it was certainly unambiguously articulated in 1981 when § 41.51(d) became effective. Furthermore, to the extent the States' obligations under section 504 were made murky in *Clark* in 1986, *Helen L.* resolved any confusion. Therefore, since 1995, the DPW can hardly claim to be surprised by the requirements of the integration mandate. Each year, the DPW decides whether to subject itself to federal regulation by accepting federal funds. Thus, following its own argument on its inevitable path, the DPW cannot be said to have been uninformed of its obligations in recent years. It is subject to suit for its current violations of section 504's requirements.

### E. Impact of *Alexander v. Sandoval* [31]

At oral argument, Defendants relied on the Supreme Court's decision in *Alexander v. Sandoval,* 531 U.S. 1049, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), which had been rendered two days before, to offer another ground to support their argument that Plaintiffs' section 504 and ADA claims fail as a matter of law.

In *Sandoval,* 121 S.Ct. at 1515, 1523, the Court determined that there exists no private right of action to enforce disparate-impact regulations promulgated under Title VI of the Civil Rights Act of 1964 ("Title VI"). According to the Defendants here, application of the *Sandoval* court's reasoning to the instant matter requires the dismissal of this action. I respectfully disagree.

In *Sandoval,* 121 S.Ct. at 1516, the Court noted that "private individuals may sue to enforce section 601 of Title VI and obtain both injunctive relief and damages." Section 601 provides:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d. With regard to section 602 of Title VI, which provides for the promulgation of regulations to effectuate

of federal financial assistance. *See Dole,* 483 U.S. at 206–07, 107 S.Ct. 2793. In order to secure the States' compliance with such conditions, Congress must unequivocally express the conditions it intends to impose unambiguously. *See Pennhurst I,* 451 U.S. at 17, 101 S.Ct. 1531.

**31.** It is not clear whether Defendants intend to challenge only Plaintiffs' integration man-

date claims (Counts I and II) or also challenge Plaintiffs' methods of administration claims (Counts III and IV). Since Defendants' memorandum on this issue was filed prior to Plaintiffs' amended complaint (in which Plaintiffs divided their original single claim into five counts), I will assume Defendants mean to challenge Counts I–IV.

section 601, however, the Court concluded that no private right of action exists because Congress displayed no intent to create such an action in enacting or amending Title VI.[32] *See id.* at 1523.

In canvassing the history of private causes of action, the Court reminded us that "private rights of action to enforce federal law must be created by Congress." *Id.* at 1519 (citing *Touche Ross & Co. v. Redington,* 442 U.S. 560, 578, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) (parenthetical omitted)). It is for the courts to interpret the statute in order to determine, not only whether it displays an intent to create a private right, but also to determine whether it creates a private remedy. *See id.* (citations omitted). Without this requisite congressional intent, a private cause of action does not exist. *See id.* Defendants do not contend that there exists no private right of action to enforce section 504 and the ADA.

In order to determine whether a tension similar to the one recognized in *Sandoval* exists between section 504 and its regulations or the ADA and its regulations, I will begin my inquiry under both section 504 and the ADA by exploring the scope of the prohibition of each statute in order to determine whether the prohibitions articulated in the regulations go beyond the statutory prohibitions.

### 1. Section 504

 Even a casual comparison of the text of section 504, *see* note 8, *supra,* and section 601 of Title VI yields the ·inevitable conclusion that Congress looked to Title VI, at least to some extent, in crafting section 504. The Supreme Court has observed that Congress modeled section 504 on Title VI. *See Choate,* 469 U.S. at 294 n. 7, 105 S.Ct. 712; *accord Helen L.,* 46 F.3d at 330 n. 8 ("The language of section 504 is virtually identical to that of section 601 of Title VI"). As the Supreme Court in *Choate,* admonished, however, "too facile an assimilation of Title VI law to § 504 must be resisted." *Choate,* 469 U.S. at 294 n. 7, 105 S.Ct. 712.

In determining whether section 504 was designed to combat only intentional discrimination, the Supreme Court observed: "Discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect." *Id.* at 295, 105 S.Ct. 712. Moreover, in discerning congressional intent regarding the formulation of section 504, it is important to note, as the Supreme Court did in *Choate,* that by the time Congress enacted section 504,

> model Title VI enforcement regulations incorporating a disparate-impact standard had been drafted by a Presidential task force and the Justice Department, and every Cabinet Department and about 40 federal agencies had adopted standards in which Title VI was interpreted to bar programs with a discriminatory impact. These regulations provoked some controversy in Congress, and in 1966 the House of Representatives rejected a proposed amendment that would have limited Title VI to only intentional discrimination. Thus, when Congress in 1973 adopted virtually the same language for § 504 that had been

---

**32.** Section 602 provides:

Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity ... is authorized and directed to effectuate the provisions of section [601] ... with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute

42 U.S.C. § 2000d–1 (1994).

used in Title VI, Congress was well aware of the intent/impact issue and of the fact that similar language in Title VI had been interpreted to reach disparate-impact discrimination. In refusing to expressly limit § 504 to intentional discrimination, Congress could be thought to have approved a disparate-impact standard for § 504.

*Id.* at 294 n. 11, 105 S.Ct. 712 (internal citations omitted). Thus, while the conduct regulated by section 601 of Title VI is limited to intentional discrimination, *see Sandoval,* 121 S.Ct. at 1516, the same cannot be said for section 504. With section 504, Congress clearly sought to remedy a problem of a different, and for these purposes broader, nature.

■ In their first amended complaint, Plaintiffs cite regulations for the implementation of section 504's commands, including 28 C.F.R. § 41.51(b)(3)(i) (prohibiting methods of administration which have the effect of discriminating against handicapped individuals on the basis of their handicaps); 45 C.F.R. § 84.4(b)(4) (2000) (generally same); 28 C.F.R. § 41.51(d) (requiring federal funding recipients to administer programs in the most integrated setting appropriate); and 45 C.F.R. § 84.4(b)(2) (generally same). The Defendants argue that because Congress did not authorize the promulgation of implementing regulations in enacting section 504, such regulations cannot be said to embody rights enforceable by private right of action. Defendants' logic does not necessarily follow. In *Sandoval,* the Court started its analysis with the premise that conduct resulting in a disparate impact, which may properly be prohibited by regulations promulgated under section 602, is permissible under section 601. I am not confronted with an analogous situation here. The regulations at issue in this case do not expand the scope of conduct proscribed by

Congress in enacting section 504. Consequently, unlike the task of the Court in *Sandoval,* my analysis ends without consideration of whether Congress intended to create a private right of action to enforce the regulations as distinct from the statute. I decline Defendants' invitation to expand *Sandoval* and dismiss Plaintiffs' section 504 claims.

### 2. ADA

■ Importantly, "the protections found in the ADA and in the Rehabilitation Act are interpreted similarly." *Doe v. County of Centre,* 242 F.3d 437, 446 (3d Cir.2001). The Supreme Court recognized that the courts are required "to construe the ADA to grant at least as much protection as provided by the regulations implementing the Rehabilitation Act." *Bragdon v. Abbott,* 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (referring to the directive of 42 U.S.C. § 12201(a) (1994), which provides: "Except as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 (29 U.S.C. § 790 *et seq.*) or the regulations issued by Federal agencies pursuant to such title").

In support of their allegations of violations of the ADA, Plaintiffs cite relevant Title II implementing regulations, including 28 C.F.R. § 35.130(b)(3)(i) (prohibiting use by public entities from employing methods of administration which have the effect of discriminating against qualified disabled individuals on the basis of their disabilities); and 28 C.F.R. § 35.130(d) (requiring public entities to administer programs in the most integrated setting appropriate). Defendants argue that because the so-called integration mandate cannot be found in the statutory text, Plaintiffs' ADA claims

must be dismissed in accordance with *Sandoval.* *Sandoval* teaches that private individuals cannot bring suit to enforce rights that are forbidden by implementing regulations, but permitted by the statute. The ADA, like section 504 and unlike Title VI, prohibits disparate-impact discrimination. The Defendants would be correct if the integration mandate required action or inaction beyond what is required by the statute itself. That is not the case here. The ADA regulations at issue here are merely rules for the implementation of the statutory directives; they do not prohibit otherwise permissible conduct.

A look at the findings made by Congress in enacting the ADA confirms this result. Congress enacted the ADA with the goal of assuring "equality of opportunity, full participation, independent living, and economic self-sufficiency for [individuals with disabilities]." 42 U.S.C. § 12101(a)(8). Congress noted that individuals with disabilities tend to be "isolate[d] and segregate[d]." 42 U.S.C. § 12101(a)(2). Congress explicitly intended to remedy the "discrimination against individuals with disabilities [that] persists in such critical areas as . . . institutionalization." 42 U.S.C. § 12101(a)(3). Congress noted that individuals with disabilities tend to be "isolate[d] and segregate[d]." 42 U.S.C. § 12101(a)(2). Congress specifically identified "segregation" as a form of discrimination. 42 U.S.C. § 12101(a)(5); *accord* 135 Cong. Rec. S4986 (statement of Sen. Harkin) (identifying segregation as "[d]iscrimination made illegal under the ADA").

Moreover, Congress intentionally chose "not to list all the types of actions that are included within the term 'discrimination' [under Title II], as was done in titles I and III, because [Title II] essentially simply extends the anti-discrimination prohibition embodied in section 504 to all actions of

state and local governments." H.R.Rep. No. 101–485, pt. 2, at 84 (1990), 1990 U.S. Code Cong. & Admin. News at 303; *see* H.R.Rep. No. 101–485, pt. 3, at 47 (1990) ("Unlike other titles in this Act, title II does not list all of the forms of discrimination that the title is intended to prohibit."); 135 Cong. Rec. S4986 (daily ed. May 9, 1989) (statement of Sen. Harkin) ("the purposes of the ADA include providing clear, strong, consistent, enforceable standards addressing all forms of discrimination against individuals on the basis of disability . . . This means that discrimination on the basis of disability in any form will not be tolerated").

It is therefore clear that individuals with mental disabilities are protected under the ADA against the type of discrimination Congress intended to remedy with section 504. Consequently, *Sandoval* does not preclude Plaintiffs' claims.

### F. Boundaries of Plaintiffs' ADA claims for violation of the integration mandate under *Olmstead*

Because I have found that the ADA claims contained in Counts II and IV are cognizable against Houstoun, I now consider whether the ADA claims for violation of the integration mandate brought on behalf of each Plaintiff can survive under *Olmstead.* Defendants argue that, taking Plaintiffs' claims as true for purposes of this motion, as they must, there are no set of facts under which any of the individual plaintiffs can recover.

In *Olmstead,* 527 U.S. at 587, 119 S.Ct. 2176, the Supreme Court held that Title II of the ADA requires that persons with mental disabilities be placed in community settings rather than in institutions when three conditions have been met:

the State's treatment professionals have determined that community placement is appropriate, the transfer from institu-

tional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

The Defendants contend that the Plaintiffs run afoul of *Olmstead* on two fronts. First, "none of the named plaintiffs explicitly avers that he or she actually wishes to leave NSH and receive services in a community setting (although this is, arguably, implicit)." (Mot. to Dismiss at 27). Defendants parenthetical notation and decision not to discuss this issue in their reply brief or at oral argument leads me to believe they do not mean to seriously pursue it as a ground for dismissing Plaintiffs ADA claims. Yet, because they did raise it in their motion, I will address it in short course.

As the Plaintiffs suggest, their authorization of the instant lawsuit constitutes a statement of non-opposition which is more than sufficient to meet the "liberal" notice pleading requirements of Federal Rule of Civil Procedure 8(a). *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *see Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (observing "the Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests").

Second, Defendants assert that Plaintiffs Nina S. and Steven F. have failed to meet the "recommendation" requirement of *Olmstead* because they have not been recommended for discharge. With regard to Nina S., Plaintiffs assert that a treat-ment professional has noted that discharge to a small community program would be appropriate. (First Am. Compl. at ¶ 30). Plaintiffs' averments suggest, as is clarified in Plaintiffs' response to Defendants' instant motion, that a formal recommendation for discharge has not been made because the treatment professional believed that an appropriate community placement was not available. I do not read *Olmstead* to require a formal "recommendation" for community placement, as that term may be used in the mental health field. *Olmstead* does not allow States to avoid the integration mandate by failing to require professionals to make recommendations regarding the service needs of institutionalized individuals with mental disabilities. In any event, Plaintiffs have adequately plead that Nina S. has been recommended for community placement. This factual dispute is not ripe for resolution in this procedural posture.

Plaintiffs have also pleaded with enough precision that Steven F. has been recommended for community placement. (First Am. Compl. at ¶ 44). Defendants argue that Steven F.'s claim fails because after being recommended for community placement, he was rejected from one community program. As a result, the Defendants argue, he can no longer be deemed to be "recommended" for community placement. (Def. Reply at 27). This argument is without merit. Again, any dispute of fact will be resolved at the appropriate time. At this stage, it is enough to say that Steven F.'s claims do not fail as a matter of law.

Defendants do not dispute that Kevin C. has been recommended for community placement. In fact, Kevin C. has been waiting for an opening in a particular program since January of 2000. Defendants claim that they cannot be held liable for violating the integration mandate of the ADA because Kevin C. has been placed on

a waiting list to receive community care. In the context of *Olmstead,* Defendants' argument goes to the third factor—whether community placement can be reasonably accommodated with the resources available to the State and the needs of others with mental disabilities.[33] Individuals with mental disabilities who are recommended for community placement by treatment professionals and who do not oppose such placement are not left without recourse under *Olmstead* simply because the State has secured their indefinite placement on a waiting list. *Olmstead* certainly does not provide this type of blanket insulation from liability. On the basis of the facts pleaded by Plaintiffs, a reasonable fact finder could conclude that the State failed to act reasonably in accommodating the community placement of Kevin C.[34] As a result, at this stage, I cannot find that Kevin C.'s claim fails as a matter of law.

## IV. CONCLUSION

The fact that federal judges have a great many constitutional powers and duties which enable them to resolve difficult issues with authority is put to the test in a situation like this where the law is developing and many of the principles are amorphous. Even had I the benefit of the Oracle at Delphi some of these issues will be finally resolved in another forum. Nonetheless, I believe that at this stage of the pleadings plaintiffs are entitled to proceed on several of their claims.

For the above-stated reasons, Defendants' motion is granted to the extent that

Counts II and IV are dismissed against the DPW and denied in all other respects. An appropriate order follows.

### ORDER

AND NOW, this 23rd day of July, 2001, it is hereby ORDERED as follows:

1. Defendants' motion to dismiss (Document Nos. 4 and 18) is GRANTED IN PART AND DENIED IN PART as follows:

 a. Counts II and IV are DISMISSED against the DPW;

 b. Defendants' motion is DENIED in all other respects;

2. This Court is of the opinion that this decision and accompanying order involve controlling questions of law as to which there is substantial ground for difference of opinion (and to which there has been difference of opinion among the courts) and that an immediate appeal from this order may materially advance the ultimate termination of the litigation within the meaning of 28 U.S.C. § 1292(b);

3. If no application for interlocutory appeal is made to the Third Circuit within the 10–day period provided for under 28 U.S.C. § 1292(b), Defendants shall file their response to Plaintiffs' motion for class certification by August 16, 2001. If application for interlocutory appeal is made, this action shall be STAYED

---

**33.** Since this argument was raised in the context of *Olmstead,* I will address it here only in that context. To the extent that Defendants' argument implicates issues that extend beyond the purview of *Olmstead,* such as whether undue delay in discharge to a community program can, by itself, constitute a violation of the integration mandate when all three *Olmstead* factors are satisfied, I will address

those arguments if and when they are clearly and properly raised.

**34.** I make no ruling here with regard to who has the burden of proving the elements of a claim under *Olmstead.* Although the parties' briefings suggest a dispute on this point, resolution of this issue is not required for disposition of this motion.

pending disposition of the application and ensuing appeal, if any.