**O.F. a minor by and through her guardian and next friend, N.S., Plaintiff,**

v.

**CHESTER UPLAND SCHOOL DISTRICT, et al., Defendants.**

No. 00–CV–779.

United States District Court, E.D. Pennsylvania.

Sept. 10, 2002.

Patricia M. O'Neill, Media, PA, Patricia M. O'Neill, Stinson Law Associates, Bryn Mawr, PA, Philip Matthew Stinson, Sr., Stinson Law Assoc., PC, Chester, PA, for Plaintiff.

Beth Anne Smith, Office of Attorney General, Philadelphia, PA, Michael I. Levin, Michael I. Levin and Associates, P.C., Andria L. Borock, Michael I. Levin and Associates, Huntingdon Valley, PA, for Defendants.

### *MEMORANDUM*

BUCKWALTER, District Judge.

Plaintiff O.F. ("O.F." or "Plaintiff"), a minor by and through her guardian and next friend, N.S., brings this action against Chester Upland School District ("CUSD") and the Pennsylvania Department of Education ("PDE")(together, "Defendants"), alleging violations of the Individuals with Disabilities Education Act ("IDEA"), § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (" § 504"), and the Ameri-

cans with Disabilities Act, 42 U.S.C. § 12101 ("ADA") by denying her a free appropriate public education ("FAPE"). Plaintiff also maintains a claim pursuant to 42 U.S.C. § 1983 against CUSD only for violations of the above statutes.

Plaintiff seeks (1) an award of compensatory damages, (2) injunctive relief requiring immediate implementation of crisis intervention procedures for O.F. and other similarly situated students, (3) attorney's fees and costs, and other relief as deemed appropriate by the Court. Presently before the Court are both CUSD's and PDE's Motions for Summary Judgment. For the reasons stated below, CUSD's Motion is denied, and PDE's Motion is granted in part and denied in part.

## I. FACTS

O.F. was born July 7, 1988. In approximately October 1989, amidst allegations of substance abuse and neglect on the part of her mother, custody of O.F. was transferred to her paternal grandparents. At that time, she was observed as unusually withdrawn, silent and still. Three years later, she came into her father's care, and began the 1992–93 school year in preschool. A few months later, in January 1993, her caregiver was switched to a paternal cousin.

The next Fall, in September 1993, O.F. began attending a special needs kindergarten at Wetherhill Elementary School, within the CUSD. At the time, an Individualized Education Plan ("IEP") was apparently in place for O.F. that recognized her need for some level of special education.

By September 1994, O.F. had been returned to the care of her paternal grandparents, and was moved to a different school district. She started first grade at the Scenic Hills Elementary School in the Springfield School District. Early that school year, she overturned a desk in a fit of anger. A subsequent comprehensive evaluation report ("CER") recommended her for eligibility for special education based on her language development and emotional needs.

One year later, O.F.'s caregivers changed once again. By September 1995, she was transferred for the first time into the care of her *maternal* grandparents, amidst allegations that she had witnessed her paternal grandfather sexually abuse her half-sister. Again, her change of caregiver resulted in a change of school districts, this time back into the CUSD. This year, O.F. repeated the first grade at Columbus Elementary School in the CUSD. There is no evidence that anyone at Columbus knew about (1) her earlier IEP or prior attendance in the Wetherhill's special needs kindergarten within the CUSD, or (2) her CER in the Springfield School District that recommended her for special education eligibility. No special education services were apparently provided to O.F. Nevertheless, she successfully completed first grade this year without incident.

The next school year O.F. returned to Columbus for second grade. Her teacher first noticed a change in her behavior in January 1997, culminating in a violent temper-tantrum she threw in the latter part of that month. Personnel at Columbus then learned about her prior IEP and participation in the special needs kindergarten at Wetherhill by consulting CUSD files, and sought to evaluate O.F. to determine her eligibility for special education. Her maternal grandparents briefly refused permission to do so, but granted permission on February 3. In March, O.F. and her maternal grandparents moved within the CUSD. In connection with that move, on March 7, O.F. was transferred to William Penn Elementary School. O.F.'s psychological evaluation (which concluded that

further testing was necessary to determine the reason for her behavioral problems) as well as a draft CER, were forwarded to William Penn within a week or so of her transfer.

During the period from January to March 1997, O.F.'s behavior became increasingly alarming and erratic. For example, she cut up her teddy bear with a razor blade at home, claiming that it had been threatening to kill her. As a result, O.F. began to see a therapist on an outpatient basis. Finally, in April, she left William Penn and was admitted to the Horsham Clinic for intensive therapy in the partial hospital program. She was discharged on May 23 and returned to William Penn. Her discharge report notes multiple concerns regarding her ability to return to a classroom without one-on-one supervision. The Horsham Clinic's recommendations for O.F. upon discharge included extensive therapeutic staff support, mobile therapy, work with a behavioral specialist, and placement in a small classroom with a high degree of structure and a teacher skilled at dealing with children with emotional and behavioral difficulties.

O.F. returned to William Penn for classes in May and June with at least some of these support structures in place. However, there were numerous incidents of violent conduct on her part requiring her to be physically restrained, including one incident in which five adults were apparently unable to get her under control. She was described as "destroying the school office, grabbing onto other children, and screaming and crawling around the floor."

In September 1997, O.F. returned to William Penn to start third grade. Contact with her therapeutic staff support had been broken during the summer, so CUSD assigned her a personal care aide while contact was being re-established. On September 9, O.F. was cited for refusal to do her work and threatening teachers and other students. On September 18, CUSD requested that O.F.'s maternal grandparents attend a meeting on September 22 to discuss her multi-disciplinary evaluation in order to make a determination as to whether she was eligible for special education. However, her maternal grandparents apparently did not attend the meeting. In a letter dated November 20, CUSD again requested their presence at such a meeting on November 25.

On November 25, a CER was completed for O.F. The CER concluded that O.F. was eligible for special education as a student who is seriously emotionally disturbed. At that time CUSD recognized O.F. as a member of the *Duane B.* class.[1] The CER noted that William Penn was not able to meet O.F.'s emotional and social needs without additional support. The CER recommended to the IEP team that she be placed in a small, highly structured classroom with a teacher skilled at dealing with children with emotional and behavioral disabilities. The CER further recommended that specially-designed instruction be developed for O.F., including a Behavioral Management Plan that included training in crisis management. Finally, the CER recommended that a formal transition plan be developed to assist O.F. in moving to a special education class.

On December 9, 1997, an IEP was established for O.F. Pursuant to the IEP, O.F. would be transferred back to Columbus, this time for instruction in the Emotional Support Classroom. The IEP in-

---

1. *Duane B.* is an ongoing class action suit against both the CUSD and PDE on behalf of a certified class of all CUSD students who have been determined to have emotional or behavioral handicaps. *See Duane B. v. Chester Upland School District,* Civ. A. No. 90–0326, 1990 WL 55082 (E.D.Pa. Apr. 27, 1990).

cluded related services to be provided to O.F., such as (1) a personal care aide until therapeutic staff support could be re-established, and (2) access to a behavior specialist. The IEP also called for the development of a behavior modification plan and a crisis management plan in consultation with the behavior specialist. A Notice of Recommended Assignment was approved by O.F.'s maternal grandparents shortly thereafter. O.F.'s transition began in mid-December and was concluded by early January 1998.

On February 11, 1998, O.F. became upset and could not be calmed down while at school. She became increasingly disorderly, and hurled objects against the walls. There are slightly conflicting accounts regarding some of the specifics of this incident. The police report states that O.F. punched Ms. Newland, a behavior specialist. However, in her deposition, Ms. Newland denied being punched. The police report also states that numerous school personnel were sitting on O.F. to restrain her when they arrived. However, those present later denied that anyone sat on her. In any case, there is no dispute that as a result of her actions, O.F. was forcibly restrained on the classroom floor by at least two adults for a period of time. School officials attempted to contact her grandparents, but they could not be reached. Finally, school officials summoned police and emergency medical personnel. According to the police report, upon their arrival school personnel told the police that if she were released, O.F. would "tear them apart." The police ordered her release, wherein she attempted to escape and threatened to kill the officers. The officers then handcuffed O.F. After O.F. continued kicking them, the officers restrained her legs with nylon restraints as well. O.F. was then transported to the hospital by emergency medical personnel.

Soon after this incident, O.F. was readmitted to the Horsham Clinic, and apparently never returned to the CUSD. She presently attends school and resides in Philadelphia during the week, and spends weekends with her paternal grandfather in Morton, Pennsylvania.

## II. LEGAL STANDARD

A motion for summary judgment shall be granted where all of the evidence demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

If the moving party establishes the absence of the genuine issue of material fact, the burden shifts to the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

When considering a motion for summary judgment, a court must view all inferences in a light most favorable to the nonmoving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). The nonmoving party, however, cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim. *Fireman's Ins. Co. v. Du Fresne*, 676 F.2d 965, 969 (3d Cir. 1982). To the contrary, a mere scintilla of evidence in support of the nonmoving party's position will not suffice; there must be evidence on which a jury could reasonably

find for the nonmovant. *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505. Therefore, it is plain that "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation, "[t]he moving party is 'entitled to a judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 323, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(c)).

## III. DISCUSSION

### A. CUSD's Motion for Summary Judgment

#### 1. IDEA

■■■ Congress enacted IDEA to assist states in educating disabled children. *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 247 (3d Cir.1999). In order to receive funding under IDEA, a state must provide all disabled students with FAPE. *Id.* This education must be tailored to the unique needs of the disabled student through an IEP. *See Board of Educ. v. Rowley*, 458 U.S. 176, 181–82, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). CUSD argues that the facts of record do not demonstrate a denial of FAPE. However, on the record before the Court, the clearest evidence of a denial of FAPE to O.F. is the length of time that CUSD took to evaluate her and to develop an IEP.[2] That process began in January 1997, but no IEP—the means of providing FAPE—was in place for her until December 1997.

■■■ Under IDEA, "[a]mong the specific conditions a state must satisfy is the requirement that it demonstrate that 'all children residing in the State who are disabled, regardless of the severity of their disability, and who are in need of special education and related services are identified, located, and evaluated.'" *W.B. v. Matula*, 67 F.3d 484, 492 (3d Cir.1995). IDEA's so-called "child-find" duty includes a requirement that children who are suspected of having a qualifying disability must be identified and evaluated "within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability." *Id.* at 501.

In this case, in January 1997, CUSD was aware that O.F. was having emotional difficulties in school, and that she had suffered at least one violent temper-tantrum. CUSD was also aware at this time that O.F. had formerly been placed in a special needs kindergarten at Wetherhill Elementary, within the CUSD. O.F. was referred for testing in early February. Yet no CER of O.F. was completed until November 1997, and no IEP was in place until December 1997—almost a year later. All

---

2. The Court notes that Plaintiff's counsel made no genuine attempt to marshal the facts and apply the law in his opposition to Defendants' motions. Instead, for the most part, he simply refers the Court to opinions expressed and conclusory statements made in a deposition by Dr. David Rostetter, formerly the Court's appointed Special Master in the *Duane B.* litigation. As a result of counsel's unprofessionalism, an unusual effort was required to review the record in order to understand O.F.'s factual allegations and determine whether summary judgment was warranted under the applicable law. To the extent that Dr. Rostetter's testimony was consistent with the facts of record, it assisted the Court in determining the nature of O.F.'s factual allegations. However, the Court makes no determination at this time as to whether Dr. Rostetter's testimony, if proffered, would be admissible at trial.

the while, O.F. continued to demonstrate often severe emotional and behavioral problems in school, including at least one incident in June when she needed to be physically restrained by multiple adults. CUSD argues that O.F.'s evaluation process was delayed by (1) her move within the CUSD in March and (2) her time at the Horsham Clinic in April and May. However, a draft CER and other paperwork were promptly forwarded to William Penn when she transferred schools. Furthermore, her Horsham Clinic stay should have only *underscored* her need for an appropriate and timely evaluation and IEP when she returned to school in May 1997.

In summary, the Court believes that there is evidence in the record from which a reasonable factfinder could conclude that a denial of FAPE occurred because no evaluation of O.F. was completed and no IEP was in place within a reasonable time after school officials were on notice of her behavior that was likely to indicate a disability. Significantly, in announcing the "reasonable time" standard in *Matula,* the Third Circuit noted:

> We are not unmindful of the budgetary and staffing pressures facing school officials, and we fix no bright-line rule as to what constitutes a reasonable time in light of the information and resources possessed by a given official at a given point in time. In this case, however, in order to grant summary judgment in favor of the defendant, we would have to conclude as a matter of law that a reasonable official could believe that a delay of six months, from notice and personal observation of behavior indicating a qualifying disability until referral for evaluation, did not violate the "child

find" duty. Certainly a reasonable juror could conclude otherwise—i.e. that a reasonable official would believe the duty had been violated by such a delay. Hence summary judgment in favor of defendants would be inappropriate on this basis.

*Matula,* 67 F.3d at 501. Rather than six months, in this case there was a delay of almost *twelve* months from observation until a CER was completed.[3] Summary judgment must therefore be denied.

Plaintiff makes a series of additional allegations, including, *inter alia,* that O.F.'s December IEP was deficient, that it was not properly implemented, and that the actions of CUSD personnel improperly responded to O.F.'s crisis on February 11, 1998. In denying summary judgment on the basis described above, the Court need not discuss the merits of Plaintiff's additional complaints. However, the Court notes that these allegations do not appear as strong as her claim that FAPE was denied to her from January to December 1997.

 In addition to arguing that the facts do not demonstrate a denial of FAPE, CUSD also argues that "bad faith or egregious circumstances," not present on the facts of this case, are required to award compensatory damages to remedy such a denial. CUSD relies on the Third Circuit's decision in *Carlisle Area School v. Scott P.,* 62 F.3d 520 (3d Cir.1995), which specifically dealt with compensatory education, rather than damages in general. However, *Scott P.* did not adopt a "bad faith or egregious circumstances" standard, and such a standard was subsequently explicitly rejected by the Third Circuit. As that court explained in *Ridgewood,* 172 F.3d at 249–50:

---

3. The six month delay referenced by the Third Circuit in *Matula* was measured between the notice of behavior indicating a qualifying disability and referral for an evaluation. In this case, delay of almost twelve months separates such behavior from the *completion* of the evaluation. The Court sees no legally significant difference between the two.

In *Carlisle Area School District v. Scott P.*, 62 F.3d 520 (3d Cir.1995), we declined to state a precise standard for the award of compensatory education, but noted that most of our cases awarding compensatory education involve egregious circumstances or the flagrant failure to comply with IDEA. *Id.* at 536–37. One year later, in *M.C. v. Central Regional School District*, we "flesh[ed] out the standard left sparse by *Carlisle*" and held that the right to compensatory education accrues when the school knows or should know that its IEP is not providing an appropriate education. *See M.C.*, 81 F.3d at 396. We specifically rejected a bad faith or egregious circumstances standard, stating that "a child's entitlement to special education should not ... be abridged because the [school] district's behavior did not rise to the level of slothfulness or bad faith." Under *M.C.*, then, it is clear that the Court need not find bad faith or egregious circumstances in order to award compensatory education to O.F. Furthermore, these Third Circuit cases do not require that such a standard be met for an award of compensatory relief in general. Therefore, the Court need not decide whether the record supports a finding of bad faith or egregious circumstances at this time. The Court reserves judgment as to the appropriateness of any specific form of relief if an IDEA violation is ultimately demonstrated in this case.[4]

Finally, CUSD also contends that Plaintiff has not exhausted her administrative remedies under IDEA and does not meet the statutory requirements for filing a civil action alleging violations of IDEA. However, this Court ruled on these matters in denying CUSD's motion to dismiss. *See O.F. v. Chester Upland School District*, Civ. A. No. 00–779, 2000 WL 424276 at *2 (E.D.Pa. April 19, 2000). The Court will not revisit these issues.

## 2. Section 504 of the Rehabilitation Act of 1973

■ To establish a violation of § 504, Plaintiff must demonstrate that (1) O.F. is disabled as defined by the Act; (2) she is "otherwise qualified" to participate in school activities; (3) the school receives federal financial assistance; and (4) she was excluded from participation in, denied the benefits of, or subject to discrimination at, the school. *Matula*, 67 F.3d at 492. "While IDEA is phrased in terms of a state's affirmative duty to provide a free, appropriate public education, the Rehabilitation Act is worded as a negative prohibition against disability discrimination in federally funded programs." *Id.* "There appear to be few differences, if any, between IDEA's affirmative duty and § 504's negative prohibition ... the regulations implementing § 504 adopt the IDEA language, requiring that schools ... 'shall provide a free appropriate education to each qualified handicapped person in [its] jurisdiction.'" *Id.* at 492–93.

■ In this case, CUSD challenges only the last of these four elements, and

---

4. Both PDE and CUSD make additional arguments that specific forms of relief—including prospective injunctive relief and monetary damages—may not be awarded to O.F. for an IDEA violation under the facts of this case. Because the Court finds that summary judgment is not warranted on the issue of liability, and the power of the Court to fashion an appropriate remedy for an IDEA violation is quite broad, *see Matula*, 67 F.3d at 494–95,

the Court will not rule on the appropriateness of any specific form of relief at this time, except insofar as the Eleventh Amendment bars an award of monetary damages under the ADA against PDE as a matter of law. *See* discussion *infra* at pp. 422–425. However, the Court notes that an award of monetary damages to compensate a plaintiff for an IDEA violation is an extraordinary remedy.

argues that in order to demonstrate that O.F. was "excluded from participation in, denied the benefits of, or subject to discrimination" at school, she must demonstrate "gross misjudgment or bad faith" on the part of school officials. CUSD cites case law from other circuits, as well as at least one case within this Circuit. *See McKellar v. Pennsylvania Dep't of Education,* Civ. A. No. 98–CV–4161, 1999 WL 124381 (E.D.Pa. Feb. 23, 1999).

However, after *McKellar* was decided, the Third Circuit subsequently rejected that standard in *Ridgewood.* In that case, that court reaffirmed its holding in *Matula* that to show a violation of § 504, "the plaintiff must demonstrate that defendants know or should be reasonably expected to know of his disability ... But a plaintiff need not prove that defendants' discrimination was intentional." *Ridgewood,* 172 F.3d at 253. The court did not adopt the "gross misjudgment or bad faith" standard urged by CUSD. As a result, this Court need not decide whether CUSD's actions amount to such.

■■■ The Court finds that there is sufficient evidence in the record from which a reasonable factfinder could conclude that CUSD denied FAPE to O.F. at a time when it knew or should have reasonably expected to know of her disability. Therefore, summary judgment in favor of CUSD is denied as to her claims under § 504 claims as well.[5]

### 3. 42 U.S.C. § 1983

■■■ To support a claim for relief in an action brought under § 1983, plaintiffs must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law. *See American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). A government entity may be held responsible under § 1983 when injury is inflicted by "execution of a government's policy or custom, whether made by its lawmakers, or by those whose edicts or acts may be fairly be said to represent official policy." *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 694–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Under Third Circuit precedent, a policy is established "[w]hen a 'decision maker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Andrews v. Philadelphia,* 895 F.2d 1469, 1480 (3d Cir.1990). Similarly, a custom may be identified through "[a] course of conduct ... when, although not authorized by law, 'such practices of state officials [are] so permanent and well-settled' so as to virtually constitute law." *Id.*

CUSD argues that Plaintiff's only allegations relevant to § 1983 concern its alleged failure to train its employees regarding crisis intervention procedures and the use of passive restraint and de-escalation techniques. Importing the Supreme Court's jurisprudence applicable to cases in which a municipality's failure to train its employees may give rise to § 1983 liability, CUSD argues that the evidence supporting

5. CUSD also argues that due to the similarities between § 504 and the ADA, Plaintiff must also demonstrate "gross misjudgment or bad faith" to demonstrate illegal discrimination under the ADA. This narrow argument fails because § 504 does not require such under the law of this Circuit, as described above. (Additionally, none of the cases cited by CUSD apply this standard to the ADA.) CUSD makes no further argument as to why summary judgment is proper on Plaintiff's ADA claim. Therefore, the Court will also deny summary judgment as to Plaintiff's ADA claim.

these allegations does not demonstrate the requisite levels of culpability and causation. As CUSD points out, in such cases, a plaintiff must demonstrate "deliberate indifference" on the part of the municipality and must show that the municipality's actions were "the moving force" behind his injury. *See Canton v. Harris*, 489 U.S. 378, 388–91, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

The Court need not resolve these issues as directed to the allegations cited by CUSD in order to conclude that summary judgment must be denied on Plaintiff's § 1983 claim, since CUSD improperly attempts to limit Plaintiff's allegations to those surrounding the February 12, 1998 crisis. As described *supra*, Plaintiff's allegations regarding a denial of FAPE are more sweeping in time. At a minimum, the evidence of record concerning Plaintiff's most obvious allegation—that she was denied FAPE from January to December 1997—is sufficient to sustain a § 1983 claim.[6] This allegation does not present the issues of culpability and causation present in "failure to train" cases, and there is no need to import the Supreme Court jurisprudence concerning those cases.

■■■■ The Supreme Court explained the reason behind the unique issues presented in "failure to train" cases in *Board*

*of the County Comm'rs v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). As it had held in *Monell*, a municipality may not be held liable under § 1983 under a theory of *respondeat superior*, or simply because it employs a tortfeasor. *Id.* at 403, 117 S.Ct. 1382. Therefore, "failure to train" claims against municipalities, which do "not involv[e] an allegation that the municipal action itself violated federal law, or directed or authorized the deprivation of federal rights, present . . . difficult problems of proof," *id.* at 406, 117 S.Ct. 1382, and require "rigorous standards of culpability and causation . . . to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* at 405, 117 S.Ct. 1382. As noted above, in such cases a plaintiff must demonstrate "deliberate indifference" on the part of the municipality and must show specifically that the municipality's actions were "the moving force" behind his injury. *See Canton*, 489 U.S. at 388–91, 109 S.Ct. 1197.

■■■■ In contrast, "[w]here a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward." *Brown*, 520 U.S. at 404, 117 S.Ct. 1382 (emphasis added). "Section 1983 itself 'contains no state-of-mind requirement in-

---

6. In failing to address O.F.'s allegation of a denial of FAPE during this time, CUSD may implicitly be contending that such a denial is neither a "policy" nor a "custom" of CUSD that is actionable under § 1983. However, Third Circuit cases such as *Matula* and *Ridgewood* appear to presume that the denial of FAPE to a child due to an inappropriate IEP constitutes a "policy" by the school district that is actionable under § 1983. Therefore, a similar denial of FAPE through the failure to evaluate a child within a reasonable period of time (and failure to provide any IEP at all during that time) is also a *de facto* actionable policy. However, even if this failure to pro-

vide FAPE did not constitute a policy, a "custom" of CUSD's denial of FAPE to its students is also apparent in connection with the *Duane B.* litigation. The repeated failure of both Defendants to achieve compliance with the Court's remedial orders and to provide members of the class with FAPE during the relevant time period is a matter of public record. *See, e.g., Duane B. v. Chester Upland School District*, Civ. A. No. 90–0326, 2000 WL 326188 at *1 (E.D.Pa. Mar. 16, 2000); *Duane B. v. Chester Upland School District*, Civ. A. No. 90–0326, 1994 WL 724991 at *12 (E.D.Pa. Dec. 29, 1994).

dependent of that necessary to state a violation' of the underlying federal right." *Id.* at 405, 117 S.Ct. 1382. "Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains." *Id.*

O.F.'s denial of FAPE claim is similarly an allegation that CUSD's inaction *itself* violated federal law, as it is charged with providing her FAPE under IDEA. There is no reason for the Court to import the "deliberate indifference" standard of culpability or question whether CUSD was the cause of O.F.'s alleged denial of FAPE. Third Circuit precedent appears to implicitly buttress this conclusion. In *Matula,* the Third Circuit specifically held that a plaintiff may sue under § 1983 for a denial of FAPE under IDEA, and did so without reference to any "deliberate indifference" standard. *Matula,* 67 F.3d at 493–95. In *Ridgewood,* that court also denied summary judgment on such a claim because the trial court had not considered whether a plaintiff's IEP was appropriate during a particular period of time. *Ridgewood,* 172 F.3d at 252–53. These cases appear to presume that a denial of FAPE by a municipality is itself sufficient to give rise to a § 1983 cause of action without meeting any heightened culpability or causation standard.

As a result, CUSD's Motion for Summary Judgment is denied.

### B. PDE's Motion for Summary Judgment

#### 1. IDEA

■ PDE, like CUSD, also argues that the facts of record do not demonstrate that O.F. was denied FAPE under IDEA. However, PDE does not address—at all—the length of time that it took to evaluate O.F.

and to author an IEP for her. For substantially the same reasons the Court denied CUSD's Motion for Summary Judgment on her IDEA claim, it denies PDE's Motion as well.

■ PDE does offer one additional argument that the Court must address. PDE argues that Plaintiff cannot demonstrate that it was *PDE's* action or inaction (as opposed to CUSD's) that violated IDEA or resulted in a denial of FAPE to O.F. PDE argues that a state education agency is required to provide direct services to a disabled student or to compel a school district to implement an IEP only when plaintiff establishes: (1) a significant breach of responsibility by the local school district; (2) adequate notice by the child's representative to the responsible state officials of the local school district's noncompliance; and (3) a reasonable opportunity for the state educational authority to compel local compliance. *See Doe v. Maher,* 793 F.2d 1470, 1492 (9th Cir.1986), *aff'd as modified on other grounds sub. nom. Honig v. Doe,* 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). PDE states that it was never informed about O.F. or any problems with her education prior to February 11, 1998.

Even assuming these prerequisites are the law of this Circuit, they are satisfied through the *Duane B.* proceedings. First, the facts acknowledged pursuant to that litigation reflect a significant breach of responsibility by CUSD regarding its students with emotional and behavioral handicaps, such as O.F. Indeed, in 1999 the parties stipulated that "[a] substantial number of class members have not received a free appropriate education (FAPE) since the Court's Order of May 30, 1997." *Duane B. v. Chester Upland School District,* Civ. A. No. 90–0326, 2000 WL 326188 at *1 (E.D.Pa. Mar. 16, 2000).

Second, as a co-defendant in that matter, PDE obviously had adequate notice of this noncompliance. Third, and most importantly, PDE had more than a reasonable opportunity to compel local compliance—it had (and has) a particularized obligation to do so. The Remedial Orders in the *Duane B.* case require PDE to "comply with all state and federal laws regarding special education," to audit CUSD's compliance with special education laws, and ensure that deficiencies are promptly remedied. *See Duane B. v. Chester Upland School District,* Civ. A. No. 90–0326, 1994 WL 724991 at *9 (E.D.Pa. Dec. 29, 1994). Under these circumstances, PDE may be held liable for the failure to promptly evaluate O.F. and provide her with FAPE.

### 2. Section 504 of the Rehabilitation Act of 1973 and the ADA

PDE also argues that Plaintiff cannot make out a claim under either § 504 or the ADA. However, like CUSD, PDE focuses solely on O.F.'s allegations regarding the February 11, 1998 incident, and urges the application of legal standards that do not reflect the law of this Circuit. As a result, for the same reasons as described *supra*, these arguments are similarly unpersuasive.

PDE also argues that these claims, to the extent they are claims for monetary damages, are barred by the sovereign immunity afforded the states under the Eleventh Amendment. The Court previously implicitly ruled on these arguments in denying PDE's motion to dismiss. *See O.F. v. Chester Upland School District,* Civ. A. No. 00–779, 2000 WL 572708 (E.D.Pa. May 10, 2000). However, since the Supreme

Court decided a highly relevant case in the interim, *Board of Trustees of the Univ. of Alabama v. Garrett,* 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001), the Court will revisit these issues.

Generally, pursuant to the Eleventh Amendment, states are immune from suit by private parties in the federal courts. *Lavia v. Pennsylvania,* 224 F.3d 190, 195 (3d Cir.2000). The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. In this case, Plaintiff is suing an agency of her own state of citizenship. However, the Eleventh Amendment is interpreted to prohibit such suits as well. *See Garrett,* 121 S.Ct. at 962.

A state is not entitled to Eleventh Amendment immunity if (1) it has waived its immunity, or (2) Congress has validly abrogated its immunity. *See Lavia,* 224 F.3d at 195. In this case, PDE claims that Congress has not validly abrogated its immunity from suits for money damages under § 504 and Title II of the ADA.[7] The Court first considers PDE's immunity argument as to Title II.

Congress may abrogate a state's sovereign immunity only if it (1) unequivocally expresses its intent to do so and (2) acts pursuant to a valid exercise of power under § 5 of the Fourteenth Amendment. *Garrett,* 121 S.Ct. at 962. *See also Kimel*

---

7. Plaintiff sues under Title II of the ADA. Title II concerns discrimination in public accommodations, and reads in relevant part: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *See* 42 U.S.C. § 12132.

*v. Florida Bd. of Regents,* 528 U.S. 62, 73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). The ADA clearly states Congress' intent to hold states liable for violations of the ADA.[8] *See Lavia,* 224 F.3d at 196. Therefore, the only issue in dispute is whether Congress properly exercised its power under § 5 of the Fourteenth Amendment in enacting Title II.

 Section 5 is the enforcement provision of the Fourteenth Amendment that allows Congress to enact "appropriate legislation" to remedy or deter violations of the Amendment's due process and equal protection guarantees. *Garrett,* 121 S.Ct. at 963. Congress's § 5 authority is appropriately exercised only in response to state transgressions which demonstrate a history and pattern of unconstitutional discrimination by the states. *See id.* at 964. Such legislation may prohibit conduct which does not itself constitute a constitutional violation. *Kimel,* 528 U.S. at 81, 120 S.Ct. 631. However, § 5 legislation reaching beyond the scope of the Fourteenth Amendment's actual guarantees "must exhibit 'congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.' " *Garrett,* 121 S.Ct. at 963 (quoting *City of Boerne v. Flores,* 521 U.S. 507, 520, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)).

In *Garrett,* the Supreme Court decided the issue of whether Congress properly exercised its power under § 5 of the Fourteenth Amendment with regard to suits under *Title I* of the ADA.[9] The Supreme Court began its analysis by seeking to identify the parameters of the constitutional right at issue. *Garrett,* 121 S.Ct. at 963. Relying on its earlier holding in *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), the Supreme Court reaffirmed that the "States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational." *Garrett,* 121 S.Ct. at 964. Therefore, the Supreme Court found, in effect, that the constitutional right at issue protects the disabled only from irrational discrimination (discrimination for which there is no rational relationship between the disparity of treatment and some legitimate government purpose) on the part of the states.

The Supreme Court then sought to determine whether Congress "identified a history and pattern of unconstitutional employment discrimination by the States against the disabled" such that the exercise of § 5 authority was warranted. *Garrett,* 121 S.Ct. at 964. It concluded that "[t]he legislative record of the ADA ... simply fails to show that Congress did in fact identify a pattern of irrational state discrimination in employment against the disabled." *Id.* at 965. The Court then went further, holding that "even if it were possible to squeeze out of [the legislative record] a pattern of unconstitutional discrimination by the States," Title I's remedies are not sufficiently congruent and proportional to any finding of unconstitutional discrimination. *Id.* at 966.

---

8. The ADA provides that: "[a] State shall not be immune under the [E]leventh [A]mendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." 42 U.S.C. § 12202.

9. Title I of the ADA concerns employment discrimination and reads in relevant part:

"No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *See* 42 U.S.C. § 12112.

■ Because Congress made no finding of a pattern of discrimination by the states which violates the Fourteenth Amendment, and the remedies imposed by Congress in Title I are not congruent and proportional to the targeted violation, the Supreme Court concluded that Congress did not properly exercise its power under § 5 of the Fourteenth Amendment. *See id.* at 967–68. As a result, individual lawsuits for money damages against a state for failure to comply with Title I of the ADA are barred by the Eleventh Amendment. *Id.*

■ Both the Supreme Court in *Garrett* and the Third Circuit in *Lavia* declined to address the question of whether Congress validly abrogated the states' immunity in enacting *Title II* of the ADA, which is at issue here. However, most courts in this Circuit that have considered this issue after *Garrett* have determined that Congress did not validly abrogate the states' immunity when it enacted Title II, because Title II—like Title I—does not reflect a valid exercise of Congress' power under § 5 of the Fourteenth Amendment. *See, e.g., Lieberman v. Delaware,* Civ. A. No. 96–523, 2001 WL 1000936 (D.Del. Aug. 30, 2001); *Jones v. Pennsylvania,* 164 F.Supp.2d 490 (E.D.Pa.2001); *Frederick L. v. Department of Pub. Welfare,* 157 F.Supp.2d 509 (E.D.Pa.2001); *Doe v. Division of Youth & Family Servs.,* 148 F.Supp.2d 462 (D.N.J.2001).

More specifically, these courts held that, in light of *Garrett,* it is evident that Congress did not sufficiently identify a pattern of unconstitutional discrimination by the states. *See Jones,* 164 F.Supp.2d at 493–4; *Frederick L.,* 157 F.Supp.2d at 528–29; *Doe,* 148 F.Supp.2d at 487–88. Furthermore, since the affirmative duties of accommodation imposed on the states by Congress through Title II go much further than simply remedying unconstitutional discrimination against the disabled, these remedies are not congruent and proportional to the targeted violation. *See Lieberman,* 2001 WL 1000936 at *3; *Frederick L.,* 157 F.Supp.2d at 529–30; *Doe,* 148 F.Supp.2d at 488–89. This Court agrees with these conclusions. Because Title II does not reflect a valid exercise of Congress' power under § 5 of the Fourteenth Amendment, PDE's Motion for Summary Judgment is granted with regard to Plaintiff's claim for monetary damages under Title II of the ADA.

■ PDE also argues that the rationale of *Garrett* is also applicable to Plaintiff's claim for monetary damages under § 504. It argues that Congress did not validly abrogate the states' immunity when it enacted § 504, because § 504 also does not reflect a valid exercise of Congress' power under § 5 of the Fourteenth Amendment. However, as stated *supra,* a state is not entitled to Eleventh Amendment immunity if (1) it has waived its immunity, or (2) Congress has validly abrogated its immunity. *See Lavia,* 224 F.3d at 195. The Court need not address the validity of any alleged abrogation, since PDE has waived its immunity as to these claims.

■ A state may voluntarily consent to waive the immunity provided to it under the Eleventh Amendment. *See College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 670, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999); *Lavia,* 224 F.3d at 195. One manner in which a state may do so is by voluntarily participating in federal spending programs where Congress has conditioned such participation on the state's consent to waive its sovereign immunity. *See College Sav. Bank,* 527 U.S. at 686, 119 S.Ct. 2219. In order for the waiver to be valid, Congress must "manifest a clear intent to condition participation in the pro-

**426**

grams funded ... on a State's consent to waive its constitutional immunity." *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 247, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). Additionally, the state must voluntarily participate in the program by accepting the federal funds. *See College Sav. Bank,* 527 U.S. at 686, 119 S.Ct. 2219.

In *Atascadero,* because the Supreme Court held that Congress had not unambiguously expressed its intent to abrogate the states' Eleventh Amendment immunity in the Rehabilitation Act, the states were therefore not "subject to suit in federal court by litigants seeking retroactive monetary relief under § 504." *Atascadero,* 473 U.S. at 235, 105 S.Ct. 3142. However, after *Atascadero,* Congress subsequently amended the Rehabilitation Act, providing that:

> A State shall not be immune under the Eleventh Amendment ... from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 ... or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

42 U.S.C. § 2000d–7(a)(1). The Supreme Court subsequently referred to the amended provision as "an unambiguous waiver of the States' Eleventh Amendment immunity." *Lane v. Pena,* 518 U.S. 187, 200, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996).

In this case, there is no question that PDE receives relevant federal financial assistance. This Court therefore holds that it waived its Eleventh Amendment immunity regarding O.F.'s claims for monetary damages under § 504. This conclusion is consistent with the clear weight of authority on this issue. *See, e.g., A.W. v. Jersey City Public Schools,* Civ. A. No. 01–140, 2002 WL 1065685 at *5–7 (D.N.J. Mar. 27, 2002); *Lieberman,* 2001 WL 1000936 at *5–6; *Frederick L.,* 157 F.Supp.2d at 516–23; *Doe,* 148 F.Supp.2d at 491 n. 5. As a result, PDE's Motion for Summary Judgment on Plaintiff's claim for monetary damages under § 504 is denied.

## IV. CONCLUSION

CUSD's Motion for Summary Judgment is therefore denied in its entirety. PDE's Motion for Summary Judgment is granted as to Plaintiff's claims for monetary damages under the ADA. In all other respects, PDE's Motion is also denied.

An order follows.

## ORDER

AND NOW, this 9th day of September, 2002, upon consideration of Defendant Chester Upland School District's Motion for Summary Judgment (Docket No. 37), Defendant Pennsylvania Department of Education's Motion for Summary Judgment (Docket No. 38) and Plaintiff's response to both motions (Docket No. 39), it is hereby **ORDERED** that:

1. Defendant Chester Upland School District's Motion is **DENIED**.

2. Defendant Pennsylvania Department of Education's Motion is **GRANTED** as to Plaintiff's claims for monetary damages under the ADA. In all other respects, Defendant PDE's Motion is **DENIED**.

**A STATUS CONFERENCE** is scheduled for *Wednesday, September 25, 2002 at 4:00 p.m.* in the chambers of the undersigned.